

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUN 2 6 2014

_Madsen, C.J._
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on June 26, 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 79761-7 |
| | ) | |
| | ) | En Banc |
| DAYVA CROSS, | ) | |
| | ) | |
| Petitioner. | ) | Filed ___JUN 2 6 2014___ . |
| | ) | |

WIGGINS, J.—In 2001, Dayva Cross pleaded guilty to the aggravated first degree murders of his wife and two of her three daughters. A unanimous jury sentenced him to death. Cross's direct appeal before this court was unsuccessful. *State v. Cross*, 156 Wn.2d 580, 132 P.3d 80 (2006) (*Cross*). Cross subsequently filed a timely personal restraint petition, alleging multiple constitutional errors. The court decided Cross's *Alford* plea issues by separate opinion. *In re Pers. Restraint of Cross*, 178 Wn.2d 519, 309 P.3d 1186 (2013) (holding that death sentence could be predicated on *Alford*[1] plea). The remaining issues raised by Cross in his personal restraint petition are decided herein.

The core issues before us are (1) whether admission of Cross's custodial statements to Officers Greg Silcox and Bonnie Soule and Detective Jim Doyon

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

violated the Fifth Amendment to the United States Constitution; (2) whether there was cumulative error; (3) whether Cross's attorneys rendered ineffective assistance of counsel; and (4) whether our death penalty statute is unconstitutional.

We reject all of Cross's claims and dismiss the personal restraint petition because Cross has not shown actual and substantial prejudice resulting from any alleged error or deficient conduct. We hold that the *Miranda*[2] violations were harmless, there was no cumulative error, any deficient performance by counsel was nonprejudicial, and our death penalty statutes are constitutional.

## FACTS

On March 9, 1999, Cross struck his wife, Anoutchka, in the face during an argument. The next morning, Anoutchka's 13-year-old daughter, M.B., woke to the sounds of Cross brutally and repeatedly stabbing her mother and her elder sister, 18-year-old Solome, to death. Cross then forced his way into the bedroom M.B. shared with her 15-year-old sister, Amanda, and killed Amanda. Cross kept M.B. confined at knifepoint for five hours while he drank wine and watched television. M.B. escaped after he fell asleep. Cross was arrested without incident that afternoon.

Initially, Cross pleaded not guilty by reason of insanity but subsequently withdrew his not guilty plea and entered an *Alford* plea for the first degree aggravated murders of his wife and two of her three daughters. *See Alford*, 400 U.S. 25; *State v. Newton*, 87 Wn.2d 363, 552 P.2d 682 (1976). The trial judge accepted Cross's plea

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

after a probing inquiry, which included a competency evaluation at Western State Hospital and review of extensive argument and evidence.

The penalty phase of trial followed. The jury heard and considered testimony from experts, from Cross's family, and from friends and family of his victims and unanimously found beyond a reasonable doubt that mercy was not warranted. Cross was sentenced to death. Cross appealed directly to this court; we affirmed Cross's conviction and his death penalty sentence. *Cross*, 156 Wn.2d 580. Cross then timely filed this personal restraint petition.

## PERSONAL RESTRAINT PETITION STANDARDS

We are reluctant to disturb a settled judicial decision where the petitioner has already had an opportunity to appeal to a disinterested judge. *See In re Pers. Restraint of Cook*, 114 Wn.2d 802, 809, 792 P.2d 506 (1990). Accordingly, a personal restraint petitioner must first establish by a preponderance of the evidence that a constitutional error has resulted in actual and substantial prejudice. *In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 607, 316 P.3d 1007 (2014); *see also In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 298-99, 88 P.3d 390 (2004); *State v. Sandoval*, 171 Wn.2d 163, 168, 249 P.3d 1015 (2011).

For alleged nonconstitutional error, a petitioner must show "a fundamental defect resulting in a complete miscarriage of justice." *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007). These threshold requirements reinforce the court's interest in finality of the trial process. *In re Pers. Restraint of Stockwell*, 179 Wn.2d at 596-97. But where the petitioner has not had a prior opportunity for judicial review, the petitioner need show only that he is restrained under RAP 16.4(b) and that

the restraint is unlawful under RAP 16.4(c). *In re Pers. Restraint of Grantham*, 168 Wn.2d 204, 212, 227 P.3d 285 (2010).

Here, Cross essentially claims four constitutional errors: (1) improper admission of custodial statements in violation of his Fifth Amendment privilege against self-incrimination, (2) cumulative error in violation of the due process clause (U.S. CONST. amends. V, XIV), (3) ineffective assistance of counsel in violation of his right to assistance of counsel under the Sixth Amendment to the United States Constitution, and (4) that his death sentence is cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.[3] Cross has had an opportunity for prior judicial review of these claims; errors asserted in the petition appear in the trial court record and were reviewable by our court on his direct appeal. Thus, Cross must show actual and substantial prejudice resulting from these alleged constitutional errors. In other words, he must show by a preponderance of the evidence that he was more likely than not harmed by the errors. *See In re Pers. Restraint of Crace*, 174 Wn.2d 835, 845, 280 P.3d 1102 (2012).

## ANALYSIS

### I. Cross's Custodial Statements to Officers Silcox and Soule

Cross argues that admission of his custodial statements to Officers Silcox and Soule violated the Fifth Amendment to the United States Constitution (no person "shall be compelled in any criminal case to be a witness against himself . . ."). On direct

---

[3] Cross also argues that his death sentence contravenes article I, section 14 of the Washington Constitution. And, Cross argues, because the death penalty is arbitrarily and capriciously applied, his death sentence violates his right to due process under the Fifth Amendment.

appeal, Cross made a similar claim. Ordinarily, a "petitioner in a personal restraint petition is prohibited from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004) (footnotes omitted). But, if petitioner's first attempt to raise an issue does not trigger any judicial consideration of it and there is no reasonable basis to conclude that the issue's merits were previously heard and determined, the issue may be raised again. *In re Pers. Restraint of Greening*, 141 Wn.2d 687, 700, 9 P.3d 206 (2000). Here, Cross assigned error to the admission of all of his custodial statements on direct appeal, but this court's decision addressed only Cross's statements to Detective Doyon. *Cross*, 156 Wn.2d at 619. Thus, Cross may raise this issue in his petition. We find that it was a violation of Cross's Fifth Amendment right to admit his custodial statements made to Officers Soule and Silcox. But we deny Cross's petition because the error was harmless.[4]

*A. Relevant Facts*[5]

On the afternoon of the murders, officers arrested Cross and placed him in a patrol car. On the way to the station, Cross was advised of his constitutional rights pursuant to *Miranda,* 384 U.S. 436. Cross acknowledged that he understood his

---

[4] This is not a case in which the court has reframed an issue and then resolved it as reframed. Instead, the court overlooked an issue raised by the defendant on direct appeal and the issue remains unresolved. Thus, despite Cross's failure to raise the Fifth Amendment issue in his motion for reconsideration, we address the issue here and apply the harmless error standard as a matter of our discretion, noting that this is a death penalty case; our "'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Kyles v. Whitley,* 514 U.S. 419, 422, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (quoting *Burger v. Kemp,* 483 U.S. 776, 785, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987)).

[5] The following facts appear in the trial judge's written findings of facts and conclusions of law following defense counsel's CrR 3.5 motion to suppress the defendant's statements. They are undisputed facts.

rights. At the station, Officer Silcox advised Cross of his *Miranda* rights for a second time. After acknowledging once more that he understood his rights, Cross stated, "I don't want to talk about it." Silcox walked away and then returned to offer Cross a glass of water. Taking pity on Cross, Silcox said, "Sometimes we do things we normally wouldn't do, and we feel bad about it later." Cross did not drink the glass of water. Cross then said, "I fucking had it. How can you feel good about doing something like this. I can't find a job, they want a thousand dollars in fucking child support. I fucking had it. And my ex-wife is fucking lucky, because she was next on the list."

Officer Soule was present when Cross stated he did not want to talk about it. Cross was then moved into a holding cell. Soule approached Cross in the cell and asked, "Do you want to talk about it?" Cross responded with the same statement—that he had "fucking had it" with the child support and that his ex-wife was next on the list. About three and a half hours later, Cross met with his attorney. Because Cross was classified as a high-security inmate, Cross was escorted to one side of a room partitioned by glass. He communicated with his attorney, who sat on the other side of the glass partition, via a telephone. There was a small opening in the glass partition above the counter, called the "pass-through slot," to exchange documents. Once Cross was inside the room, he was left alone and the door was closed with the officers stationed outside. The officers could not overhear any conversation between Cross and his attorney. At some point during the conversation, the attorney signaled to correction officers that Cross needed to sign some documents. There is a policy that inmates are not allowed to possess pens, so Officer Rosalind Deede stood by while

Cross signed the documents and passed them through to his attorney. The attorney slid a copy back to Cross. At this time, Officer Marshall Coolidge entered the room, thinking they were getting ready to take Cross back to his cell because the interview was over. When the documents were passed back through the slot to Cross, Cross yelled, "I don't need that. I don't give a fuck. The motherfuckers are all dead. I killed them. My life is over." Both Officers Deede and Coolidge heard the statement. In addition, the statement was loud enough to be heard outside the closed door.

On April 6, 2000, before Cross entered his guilty plea, his counsel moved to suppress all of Cross's custodial statements. But on May 1, 2000, defense counsel conceded that Cross's tape-recorded statements to Detective Doyon were admissible under CrR 3.5.[6] Thus, the only issues remaining were whether Cross's statements to Officers Silcox and Soule, and those heard by Corrections Officers Coolidge and Deede, were admissible. On September 7, 2000, the judge made findings of facts and conclusions of law, ultimately admitting all of Cross's custodial statements. The judge found that Cross had not invoked his right to remain silent, Silcox's comment was not interrogation, and Cross validly waived his *Miranda* rights. On October 23,

---

[6] In Cross's direct appeal, in the written findings of fact and conclusions of law on the motion to suppress, the trial judge found that "defense counsel conceded that the interview with Detective Doyon was properly admissible." *Cross*, 156 Wn.2d at 619 n.12. But we assumed this was scrivener's error because Cross's trial counsel had filed a motion to suppress and counsel's subsequent concession of this issue was ambiguous. *Id.* However, upon further review of the record and in light of declarations filed in support of Cross's personal restraint petition, it appears this was not scrivener's error. Cross's appellate attorneys Mark Larranaga and Richard Warner both recall withdrawing their motion to suppress Cross's statements to Detective Doyon. Their declarations clarify any ambiguity in the record. Thus, we find that defense counsel did concede that Cross's custodial statements made to Detective Doyon were admissible.

2000, Cross entered his *Alford* plea of guilty. Cross's custodial statements were used as evidence in the sentencing phase.

### B. Standard of Review

Whether Cross unequivocally invoked his *Miranda* rights is a mixed question of law and fact. *Cf. State v. Rankin,* 151 Wn.2d 689, 709, 92 P.3d 202 (2004) (whether or not a suspect is seized by police for *Miranda* purposes is a mixed question of law and fact) (citing *State v. Thorn,* 129 Wn.2d 347, 351, 917 P.2d 108 (1996)). Accordingly, we defer to the trial court's findings of fact but review its legal conclusions from those findings de novo.[7] *See State v. Broadaway,* 133 Wn.2d 118, 131, 942 P.2d 363 (1997); *see also State v. Duncan,* 146 Wn.2d 166, 171, 43 P.3d 513 (2002) (citing *State v. Mendez,* 137 Wn.2d 208, 214, 970 P.2d 722 (1999)). This same binary standard of review applies when determining whether officers are engaged in "interrogation" for *Miranda* purposes.[8] *United States v. Poole,* 794 F.2d 462, 465 (9th

---

[7] In *Cross,* 156 Wn.2d at 619, we purported to review the trial court's decision to admit Cross's custodial statements for abuse of discretion. But we, in fact, properly accepted unchallenged facts in the record as verities and reviewed de novo the trial court's legal rulings. *See id.* at 620-21 (reviewing the transcript of the interview; no mention of deference). To be clear, consistent with federal courts, we recognize that *Miranda* issues involve a mixed question of law and fact; legal conclusions are subject to de novo review. *See State v. Daniels,* 160 Wn.2d 256, 261, 156 P.3d 905 (2007) (*Miranda* claims are issues of law that we review de novo; unchallenged findings of fact are binding on appeal); *see also Thompson v. Keohane,* 516 U.S. 99, 121, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (state court "in custody" rulings subject to de novo review); *cf. United States v. Narvaez–Gomez,* 489 F.3d 970, 973 (9th Cir. 2007) (this court reviews a trial court's legal conclusions on *Miranda* waivers de novo and findings of fact underlying those conclusions for clear error); *accord State v. Campos-Cerna,* 154 Wn. App. 702, 708, 226 P.3d 185 (2010); *United States v. Becerra–Garcia,* 397 F.3d 1167, 1172 (9th Cir. 2005); *United States v. Rodriguez,* 518 F.3d 1072, 1076 (9th Cir. 2008); *State v. Lorenz,* 152 Wn.2d 22, 36, 93 P.3d 133 (2004) (reviewing whether a defendant is "in custody" for *Miranda* purposes de novo).

[8] In *State v. Walton,* 64 Wn. App. 410, 414, 824 P.2d 533 (1992), a Washington appellate court held that the issue of interrogation is factual, subject to a clearly erroneous standard.

Cir. 1986). Because neither party has assigned error to any of the trial court's findings of fact, our review is limited to a de novo determination of whether the trial court derived proper conclusions of law from its findings. If we determine there was error, the state bears the burden of showing that the error was harmless beyond a reasonable doubt. *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996).

## C. An Invocation of Miranda Rights Must Be Unequivocal

In *Miranda*, 384 U.S. at 457-58, the Supreme Court established a conclusive presumption that all confessions or admissions made during a custodial interrogation are compelled in violation of the Fifth Amendment's privilege against self-incrimination. This presumption is overcome only upon a showing that law enforcement officials informed the suspect of his or her right to remain silent and right to an attorney and that the suspect knowingly and intelligently waived those rights. *Id.* at 479. A suspect may choose to invoke these rights at any time prior to or during questioning.[9] *Id.* at 472-73.

If the suspect's invocation of his right is *equivocal*, then officers may carry on questioning. *Davis v. United States*, 512 U.S. 452, 461-62, 114 S. Ct. 2350, 120 L.

---

*Accord State v. Denney*, 152 Wn. App. 665, 671, 218 P.3d 633 (2009). However, the clearly erroneous standard under *Walton* is no longer good law because the Ninth Circuit case upon which it relies, *United States v. Booth*, 669 F.2d 1231 (9th Cir.1981), was overruled by *United States v. Poole*, 794 F.2d 462 (9th Cir. 1986) (district court's determination on issue of interrogation is subject to de novo review).

[9] The Supreme Court has subsequently held that an invocation of the right to remain silent and an invocation of the right to counsel are treated similarly in that an unequivocal invocation of either right is sufficient to terminate an interrogation. *Berghuis v. Thompkins*, 560 U.S. 370, 381, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (citing *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975)).

Ed. 2d 362 (1994). They are not required to clarify whether or not the suspect actually meant to invoke *Miranda*. *Id.* However, if the invocation is *unequivocal*, the police must stop their questioning immediately. They may not resume discussion with the suspect until the suspect reinitiates further communication with the police, or a significant period of time has passed and officers reissue a fresh set of *Miranda* warnings and obtain a valid waiver. *Miranda*, 384 U.S. at 473-74; *see Michigan v. Mosley*, 423 U.S. 96, 103-04, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

An invocation of *Miranda* rights is unequivocal so long as a "reasonable police officer in the circumstances" would understand it to be an assertion of the suspect's rights. *Davis*, 512 U.S. at 459. This test encompasses both the plain language and the context of the suspect's purported invocation. *Smith v. Illinois*, 469 U.S. 91, 93, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). Plain language can be, on its own, telling. For instance, a suspect invoked his *Miranda* rights when he clearly stated, "'I would rather not talk about it.'" *State v. Gutierrez*, 50 Wn. App. 583, 589, 749 P.2d 213 (1988 (emphasis omitted)). By contrast, merely announcing an intent not to say anything incriminating is not an invocation of the right to remain silent. *State v. Walker*, 129 Wn. App. 258, 274, 118 P.3d 935 (2005).

Courts must also consider the circumstances leading up to the alleged invocation. For instance, when a suspect says, "'Maybe I should talk to a lawyer'" and subsequently clarifies, "[']No, I'm not asking for a lawyer,'" the suspect has not invoked his *Miranda* rights and questioning may continue. *Davis*, 512 U.S. at 455 (alteration in original). But a court may not rely on context arising *after* the suspect's invocation to retroactively cast doubt on a facially clear and unequivocal invocation of *Miranda*

10

rights. *Smith*, 469 U.S. at 99. In *Smith*, the defendant was advised of his right to have counsel present and told the police, "'Uh, yeah, I'd like to do that.'" *Id.* at 93 (emphasis omitted). Rather than cutting off discussion, the police finished reading Smith his *Miranda* rights and asked him, "'Do you wish to talk to me at this time without a lawyer being present?'" Smith answered, "'Yeah and no, uh, I don't know what's what, really.'" *Id.* The trial court seized on Smith's latter statement as proof that Smith's invocation of *Miranda* was equivocal and admitted evidence of Smith's statements to police. The Supreme Court disagreed, holding that "[w]here nothing about the request or the circumstances *leading up to* the request would render it ambiguous, all questioning must cease." *Id.* at 98 (emphasis added). In other words, what the accused said *after* invoking his *Miranda* rights might be relevant to waiver but it was not relevant to the invocation itself. *Id.*

### D. Cross Unequivocally Invoked His Right To Remain Silent

It was objectively unreasonable for the trial court to conclude that Cross did not invoke his right to remain silent. In response to being read his *Miranda* rights, Cross told Silcox, "I don't want to talk about it." There is nothing equivocal or ambiguous about this statement. Indeed, it is difficult to imagine a clearer refusal. Any reasonable police officer, knowing that the exercise of the right to silence must be "scrupulously honored," would have understood that when Cross said he did not want to talk about "it", he meant he did not want to talk about the murders. *See Emspak v. United States,* 349 U.S. 190, 194, 75 S. Ct. 687, 99 L. Ed. 997 (1955) ("no ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination").

11

Moreover, the circumstances leading to Cross's statement indicate that Cross unequivocally invoked his right to remain silent. Cross told officers that he did not want to talk immediately after Officer Silcox read him his *Miranda* rights. Neither party disputes that Cross understood his rights. Thus, when Cross said "I don't want to talk about it," he knowingly invoked his right to remain silent. That Cross spoke with the detective *after* he invoked his rights is irrelevant. Cross's invocation of his *Miranda* right to remain silent was clear and unequivocal.

### E. *Silcox Did Not Scrupulously Honor Cross's Invocation of His Right To Remain Silent*

Although it is a closer call, it was also objectively unreasonable for the trial court to conclude that Silcox's comment that "sometimes we do things we normally wouldn't do and feel bad about it later" was not interrogation. Unlike the comment in *Rhode Island v. Innis*, 446 U.S. 291, 301-02, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), Silcox's comment was redolent of the very recent and horrific murders and, thus, appeared reasonably likely to elicit an incriminating response. Officers Silcox and Soule did not abide by Cross's clear refusal to talk, and the statements Cross made to them should not have been admitted.

"Interrogation" can be express questioning, or any words or actions reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301-02. The test for the latter category focuses primarily on the suspect's perceptions, rather than the officer's intent. "This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Id.*

at 301. On the other hand, incriminating statements that are not responsive to an officer's remarks are not products of interrogation. *State v. Bradley*, 105 Wn.2d 898, 904, 719 P.2d 546 (1986).

In *Innis*, officers were discussing the missing shotgun from the robbery while driving the defendant to the station. 446 U.S. at 291. One officer stated that there were "'a lot of handicapped children running around in this area'" because a school was located nearby, and "'God forbid one of them might find a weapon with shells and they might hurt themselves.'" *Id.* Innis, apparently worried for the children, interrupted the officers and asked them to turn back so he could show them where the gun was located. *Id.* The Supreme Court explained that "interrogation" reflects a measure of compulsion above and beyond that inherent in custody itself. *Id.* at 301. Police cannot be held accountable for the unforeseeable results of their words or actions. *Id.* at 302. Because there was nothing in the record to suggest that the officers were aware that Innis was "peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children" and because officers' comments were not particularly "evocative," the Court held that the offhand remarks were not reasonably likely to elicit an incriminating response. *Id.* at 302-03.

Here, while there was no express questioning, Officer Silcox subjected Cross to the "'functional equivalent of questioning.'" *Id.* at 302. Unlike the comment in *Innis*, Officer Silcox spoke directly to Cross. She could tell that he was upset, almost certainly because of the murders, which had just occurred that morning. The comment was evocative in that it referred to the recent killings, which were brutal and emotional and involved Cross's family. This is true even if Silcox's intent was to express

sympathy. Thus, the trial court erred in ruling that Silcox's comment was no different than the statement made in *Innis*.

Indeed, the comment "sometimes we do things we normally wouldn't do" appears reasonably likely to elicit an incriminating response. The comment implies that Cross committed the murders. While there are several possible responses to Silcox's comment, all are incriminating. *See Innis*, 446 U.S. at 301 n.5 ("incriminating response" is any response—inculpatory or exculpatory—that *prosecution* may seek to introduce at trial). For example, Cross could have remained silent, which could be evidence of his guilt; Cross could have denied committing the murders or feigned ignorance, which could have cast doubt on his character for honesty; or Cross could have done as he did and responded with what was essentially a confession. An officer's comment is designed to elicit an incriminating response when a suspect's choice of replies to that comment are all potentially incriminating.

Cross did not offer an irrelevant outburst unresponsive to Officer Silcox's comment. Cross specifically responded to Silcox's comment "sometimes we do things we normally wouldn't do and we feel bad about it later" by asking, "[H]ow can you feel good about doing something like this." Thus, although Silcox's remark was not phrased as a question, it reasonably elicited an incriminating response.

We hold that Silcox failed to scrupulously honor Cross's invocation of his right to remain silent. Silcox's statement constituted interrogation. Because Cross had previously invoked his *Miranda* rights, we hold that Silcox's statement was an improper reexamination.

F. *Cross Did Not Subsequently Waive His* Miranda *Rights*

Cross did not waive his *Miranda* rights because he never initiated further discussions with the police after he stated, "I don't want to talk about it." The State must prove the waiver of a *Miranda* right by a preponderance of the evidence. *State v. Wheeler,* 108 Wn.2d 230, 237-38, 737 P.2d 1005 (1987). If a defendant fails to unequivocally invoke his *Miranda* rights, a waiver may be inferred when a defendant freely and selectively responds to police questioning. *State v. Gross,* 23 Wn. App. 319, 597 P.2d 894 (1979) (although suspect refused to sign waiver, court could infer waiver from suspect's understanding of his rights and from his voluntary conversation with officers on all four occasions); *accord Cross,* 156 Wn.2d at 621. However, once an accused has unequivocally invoked his *Miranda* rights, waiver occurs only when the accused initiates further discussions with the police and knowingly and intelligently waives the right invoked. *Smith,* 469 U.S. at 95 (citing *Edwards v. Arizona,* 451 U.S. 477, 486 n.9, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)). Here, Cross never initiated further discussions with the police after he stated, "I don't want to talk about it." Rather, Silcox reapproached Cross.

Officer Soule also improperly reapproached Cross while he was in his holding cell to ask, "[D]o you want to talk about it?" *Cf. Smith,* 469 U.S. at 93 (detectives improperly carried on conversation by repeating Smith's *Miranda* rights to him and asking if he understood). Officer Soule heard Cross invoke his right to remain silent. Instead of waiting an appropriate amount of time and then reissuing a fresh set of *Miranda* warnings, Soule immediately approached Cross in his holding cell and asked if Cross wanted to talk. *Cf. Mosley,* 423 U.S. at 104-05 (defendant's *Miranda* rights

not violated because reinterrogation was by a different officer about a different crime and began two hours later, and new warnings were given). There was no reason for Soule to believe that Cross had subsequently waived his right to remain silent. Accordingly, Soule was required to "scrupulously honor" Cross's right to remain silent and should not have persisted in questioning Cross or in asking Cross whether he would like to talk about the murders. That Cross responded to Soule's question is not proof of waiver. *See United States v. Womack*, 542 F.2d 1047, 1050-51 (9th Cir. 1976) (where the government asserts waiver, it bears a heavy burden of proving its claim; this burden is not discharged by the mere fact that statements were eventually obtained from an accused). Thus, we hold that Cross did not subsequently waive his right to remain silent to Officers Silcox or Soule after he unequivocally stated, "I don't want to talk about it."

G. *It Was Harmless Error To Admit Cross's Custodial Statements to Silcox and Soule*

However, we deny Cross's petition because it was harmless error to admit Cross's custodial statements to Officers Silcox and Soule. Constitutional errors are harmless if the untainted evidence is so overwhelming that it necessarily leads to the same outcome. *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985). Here, even excluding Cross's statements to Officers Silcox and Soule, we hold that the error is harmless because it appears beyond a reasonable doubt that the same result would have been reached. Cross's quasi-confession—"I fucking had it. How can you feel good about doing something like this"—is not even as prejudicial as his subsequent outburst—"I don't give a fuck. The motherfuckers are all dead. I killed them. My life

16

is over." At least two officers overheard Cross yell the second statement, and it was properly admitted.[10] In addition, M.B.'s testimony that she witnessed Cross kill Amanda and heard her mother's dying screams established this as an egregious killing. See RCW 10.95.030(2).

Admission of Cross's statements regarding his frustration with paying child support and his ex-wife being next on the list were also harmless. The State presented evidence to negate the mitigating factors of mental illness and lack of planning. M.B. testified that after the murders, Cross told her that he was going to kill his ex-wife next. So, that portion of Cross's statement came in via her testimony. And, the trial court admitted the child support order, so the jury was aware that Cross owed alimony. In addition, Dr. Wheeler, the State's expert, reviewed the circumstances surrounding the murders and opined that Cross did not appear to suffer from mania or delusions and that there was evidence of planning. Dr. Wheeler pointed out Cross's increased substance abuse, stress from child support debt, partial unemployment, and increasing conflict with his wife regarding money-related issues. In fact, Cross indicated to Dr. Wheeler that he was thinking of robbing a bank as an alternative to

---

[10] Cross yelled this second statement after his attorney returned documents to him through the pass-through slot in the conference room. The trial court concluded correctly that these statements were not the product of any in-custody interrogation, nor were they provoked by any comment, statement, or conduct by the Department of Adult Detention personnel. Accordingly, Cross's right to remain silent was not violated. In addition, the trial court correctly found that Cross's Fifth Amendment right to counsel was not violated by the presence of the corrections officers. Although there were a number of officers near the attorney-client conference room, there was no intrusion into the defendant's right to have a private conference with his counsel; the room was secure and the door was closed. No one heard anything until the door was opened and Cross loudly volunteered his statement. Thus, the statements overheard by Officers Deede and Coolidge were properly admitted.

murder. This is evidence that there was some forethought to the murders and that Cross was acting clearly and with intention, not as a result of mental illness.

In light of the gruesome nature of the attacks, the fact that Cross held M.B. hostage and refused her pleas to call an ambulance for Amanda, Cross's many violent outbursts in court, and M.B.'s testimony recounting the brutal murder, we hold that the jury would have found that Cross deserved a death sentence even excluding the statement to Officer Silcox. Likewise, admitting his statement to Officer Soule was harmless error because Cross's statement to Soule was identical to his statement to Silcox, and so it had no different effect on the jury.

We also hold that admission of the custodial statements was harmless with regard to Cross's decision to enter the *Alford* plea. There is no evidence that Cross would have refused to enter the plea had the statements been excluded. Cross has not moved to withdraw his *Alford* plea, and we held that Cross's plea was voluntary and intelligent. *In re Pers. Restraint of Cross*, 178 Wn.2d at 529-30. Thus, admission of Cross's custodial statements to Silcox and Soule was harmless error.

II. Cross's Custodial Statements to Detective Doyon

Once a constitutional challenge has been affirmatively withdrawn or abandoned, the challenge will not be considered on appeal. *State v. Valladares*, 99 Wn.2d 663, 672, 664 P.2d 508 (1983). Here, trial counsel withdrew their challenge to the taped-recorded statement to Detective Doyon. Thus, we will not consider any challenges to the admissibility of these statements.

III. Cumulative Error

Cross contends that he was denied due process under the cumulative error doctrine. The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless. *In re Det. of Coe,* 175 Wn.2d 482, 515, 286 P.3d 29 (2012). The test to determine whether cumulative errors require reversal of a defendant's conviction is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. *State v. Gallegos,* 286 Kan. 869, 190 P.3d 226 (2008). In other words, petitioner bears the burden of showing multiple trial errors and that the accumulated prejudice affected the outcome of the trial. *United States v. Solorio,* 669 F.3d 943, 956 (9th Cir. 2012) (no cumulative error when defendant identifies only one error). There is no prejudicial error under the cumulative error rule if the evidence is overwhelming against a defendant. *State v. Cofield,* 288 Kan. 367, 203 P.3d 1261 (2009). We hold that Cross has not met his burden of showing an accumulation of error of sufficient magnitude to warrant a retrial. *State v. Yarbrough,* 151 Wn. App. 66, 97-98, 210 P.3d 1029 (2009).

Without reference to facts, Cross summarily concludes that there was cumulative error. But, as discussed below, most of Cross's claims fail. And Cross does not specifically address the cumulative prejudicial impact of admitting his custodial statements to Officers Silcox and Soule. Thus, he has not met his burden of proof.

Moreover, Cross's case is unlike cases in which cumulative errors were found sufficient to deny the defendant a constitutionally fair trial. *See, e.g., State v. Coe,*

101 Wn.2d 772, 789, 684 P.2d 668 (1984) (cumulative error where trial errors included discovery violations, prior bad acts improperly admitted, hypnotized witnesses, and unduly prejudicial cross-examination, among others). Here, the only errors were the admission of Cross's statements to Officers Silcox and Soule. But, those errors were harmless, either alone or cumulatively, because the evidence is overwhelming against Cross. There was evidence of planning, even without reference to the custodial statements, because of the location and severity of the wounds, the evidence of domestic violence leading up to the murders, the planning and use of the murder weapons, the evidence of secondary assault, the statements Cross made to M.B., and the evidence of the forced entry. *Cross*, 156 Wn.2d at 627-28. There was also evidence of a common scheme or plan because Cross killed three people at nearly the same time, with the same weapons, in the same home. *Id.* at 629. Examining the errors in the context of the record as a whole, we find that Cross has not met his burden of proving that the cumulative effect of the above errors substantially prejudiced him and thus deprived him of a fair trial.

IV.    Ineffective Assistance of Counsel Claims

Cross also asserts numerous ineffective assistance of counsel claims. These claims all fail, either because trial counsels' performance did not fall below an objective standard of reasonableness or because there was no resulting prejudice.

*A. Relevant Facts*

During the penalty phase, Cross offered evidence of four mitigating factors: his near-lack of criminal history, the "extreme mental disturbance" he was under at the

time of the murders, the fact that he was unlikely to be a danger to others in the future, and his underlying mental disease or defect.

Immediately upon accepting the case, Cross's attorneys, Richard Warner and Mark Larranaga, began preparing a mitigation defense based on Cross's poor mental health. Cross has a long history of mental illness. He had one prior criminal conviction for misdemeanor reckless endangerment, followed by voluntary hospitalization in 1988. He left hospitalization against medical advice but sought outpatient treatment again in the 1990s. He has attempted suicide at least two times since the 1999 killings. In his first suicide attempt, two days after his arrest, Cross fractured his skull and cervical column and injured his brain and spine, rendering him a paraplegic.

During trial, Cross became increasingly opposed to presenting expert testimony on his mental health. He and his counsel clashed over this strategy question—his counsel believed Cross's best chance to avoid a death sentence was his poor mental health. Due to this conflict, Cross made multiple motions to fire his attorneys, proceed pro se, or have different counsel appointed.

After extensive briefing and argument, the trial judge ruled that appointment of independent counsel was not necessary. The trial court further held that whether mental health expert testimony would be used was a question of strategy for counsel. We affirmed both of these rulings on direct appeal. *Cross*, 156 Wn.2d at 607-10.

Cross also denied premeditating the murders, and there was evidence that he believed this would be powerful mitigating evidence. In his *Alford* plea, Cross specifically denied premeditating the murders. And during trial, Cross continued to

21

argue lack of premeditation to the sentencing jury as a mitigating factor. *Cross*, 156 Wn.2d at 604.

The jury was instructed that they could grant him mercy based on any of these factors or any other evidence they believed to be mitigating. A unanimous jury decided that there were insufficient mitigating circumstances to merit leniency.

In Cross's personal restraint petition, he submits Warner's and Larranaga's declarations, essentially stating that they were ineffective, along with declarations from two Washington attorneys opining that defense counsel provided ineffective assistance of counsel. The two attorneys based their opinions on a review of Warner's and Larranaga's declarations and a partial review of the record.

*B. Strickland Test*

To prevail on an ineffective assistance of counsel claim, a criminal defendant must demonstrate (1) deficient performance by counsel and (2) resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). If the court finds either prong has not been met, it need not address the other prong. *Id.* at 700; *accord State v. Garcia*, 57 Wn. App. 927, 932, 791 P.2d 244 (1990).

To establish deficient performance, the defendant must show that trial counsel's performance fell "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also State v. Adams*, 91 Wn.2d 86, 90, 586 P.2d 1168 (1978) (discussing development of a more objective standard akin to that used in legal malpractice cases). We evaluate the reasonableness of a particular action by

examining the circumstances at the time of the act.[11] "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. To establish prejudice in a penalty phase, defendant must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695; *see also In re Pers. Restraint of Davis*, 152 Wn.2d at 702.

Courts presume counsel's representation was effective. *Strickland,* 466 U.S. at 689; *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). The presumption is rebutted if there is no possible tactical explanation for counsel's action. *State v. Reichenbach,* 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Legitimate trial tactics or strategy cannot form the basis for an ineffective assistance of counsel claim. *State v. Garrett*, 124 Wn.2d 504, 520, 881 P.2d 185 (1994). With these principles in mind, we turn to Cross's specific claims of ineffective assistance of counsel, roughly in the order they occurred pretrial and at trial.

### C. Defense Counsels' Inexperience

Cross argues that his trial attorneys were insufficiently experienced to represent him in a capital case. This claim fails because counsel met the requirements of

---

[11] We give weight to trial counsel's recollections of an action or event. But we will scrutinize attorneys' belated assessments of the reasonableness of their actions.

Superior Court Special Proceedings Rules—Criminal Rule 2 (SPRC 2) and additionally satisfied relevant American Bar Association (ABA) guidelines.

SPRC 2 imposes minimum qualification requirements on attorneys in capital cases.[12] Specifically, at the time Cross's trial attorneys were appointed, SPRC 2 provided, "[A]t least one counsel at trial must have five years' experience in the practice of criminal law, be familiar with and experienced in the utilization of expert witnesses and evidence, and be learned in the law of capital punishment *by virtue of training or experience.*" Former SPRC 2 (1997) (emphasis added). The Supreme Court recruits and maintains a list of attorneys qualified for appointment by virtue of training or experience. *Id.* In appointing counsel for trial, the trial court will consider this list; however, the court will have the final discretion in appointment of counsel in capital cases. *Id.*

Here, Cross incorrectly argues that Larranaga and Warner were not qualified to represent him because neither had previously tried a capital case or had significant capital experience. SPRC 2 does not require counsel to have previously tried a capital case and, instead, acknowledges that an attorney may obtain qualification by virtue of training. Larranaga and Warner had both received training at seminars on capital defense. Warner attended five continuing legal education courses on capital punishment prior to the trial court's qualification determination. Larranaga attended a capital case defense seminar in 1999. In addition, both attorneys attended a capital

---

[12] SPRC 2 was amended in 2003. For purposes of reviewing whether Larranaga and Warner were qualified as counsel for Cross in his death penalty trial, this opinion refers to the pre-2003 SPRC 2.

defense training early in the Cross proceedings. Thus, both were trained in the law of capital punishment.

Cross also unconvincingly argues that Larranaga and Warner were unqualified because neither was on the list of attorneys qualified for appointment in death penalty trials. At the time of the appointment, SPRC 2 vested final appointment discretion in the trial judge. While former SPRC 2 directed the trial judge to consider the list in making the appointment, it did not require the trial judge to choose from the list. Also, to be listed, an attorney must apply and be found qualified. Thus, it is equally (if not more) likely that absence on the list is due to failure to apply, not lack of qualification. It would be another case if Cross were able to show that Warner and Larranaga had recently applied and were denied admission to the list for lack of qualification. However, Cross has made no such showing. Indeed, as of December 29, 1999, Richard Warner was admitted on the list of attorneys qualified to represent capital defendants at the trial level.[13] That neither of the attorneys appeared on the list at the exact moment of their appointment does not render them per se unqualified, especially given their demonstrated prior experience trying complex criminal cases.

Larranaga and Warner met all additional requirements under SPRC 2. Both had extensive trial experience. Warner had practiced criminal law exclusively for the previous 10 years and had handled 40 felony trials, including a first degree murder trial. Larranaga had practiced criminal law exclusively for six years previous to Cross's

---

[13] Cross's arraignment hearing before Judge Spearman was held at Harborview Medical Center on March 22, 1999. Attorneys Larranaga and Warner represented Cross at this hearing and continued to represent Cross until sentencing on July 22, 2001.

trial and had handled serious felony cases for the previous three and a half years, including two first degree murder cases. Each had significant experience with competency issues and expert witnesses, including psychological and psychiatric experts.

The trial judge reviewed Warner's and Larranaga's prior experience, training, and legal writing samples, and properly concluded that "each counsel is qualified pursuant to SPRC 2." See SPRC 2 (the trial judge shall retain responsibility for appointing counsel for trial). As an additional safeguard, the trial judge found that trial counsel met several requirements set forth in the 1989 ABA Guidelines[14] for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines).[15]

Cross also claims deficient performance due to lack of adequate supervision because no attorneys in the office had capital trial experience. But supervision is not required where the attorneys themselves are qualified. Moreover, as discussed

---

[14] The relevant ABA guidelines are those in effect at the time of trial. See In re Pers. Restraint of Yates, 177 Wn.2d 1, 41, 296 P.3d 872 (2013) (citing Bobby v. Van Hook, 558 U.S. 4, 7, 130 S. Ct. 13, 175 L. Ed. 2d 255 (2009)).

[15] Regarding prior experience, the 1989 ABA Guidelines emphasized quantitative measures of attorney experience, such as exact years of litigation experience and number of jury trials. For example, counsel should have prior experience as lead counsel in at least nine prior jury trials, including serious and complex cases. ABA GUIDELINES 5.1(1)(A)(iii), at 5. Counsel must have been lead counsel in at least three murder or aggravated murder cases, or alternatively, out of the nine required jury trials, each counsel must have tried one murder or aggravated murder trial and an additional five felony trials. Id. The trial court found that both Warner and Larranaga met these criteria. An additional ABA criteria, not reflected in SPRC 2 but which the trial court found "pertinent and relevant," was that each counsel attend training within one year of their appointment at a continuing legal education (CLE) seminar focusing on death penalty cases. Here, each counsel had attended a capital defense seminar within one year of their appointment and additionally attended another CLE, "Life Over Death," during early proceedings in this case.

earlier, prior capital experience is not a prerequisite to qualification. Seattle attorney Jeffrey Robinson's opinion that lack of supervision could have compromised the defense's preparation is germane, but it must be weighed against the ample evidence that Larranaga and Warner were qualified and the trial court's assessment that "there can be no legitimate assertion that counsel has not been thoroughly and completely competent in its presentation of this case with all of its complexities in both the guilt and penalty phase."

Thus, in view of former SPRC 2 and the *ABA Guidelines* in effect at the time, we hold that it was not deficient performance for Warner or Larranaga to accept appointment as Cross's counsel. Cross's claim that trial counsel's inexperience gave rise to ineffective assistance of counsel fails.

### D. Failure To Appoint Lead Counsel

Cross argues that his trial counsel were prejudicially ineffective because no lead counsel was ever officially appointed. This claim fails because both attorneys were qualified and the division of labor between attorneys was reasonable.

While SPRC 2 does not require that either of the two assigned counsel be designated "lead," *ABA Guidelines* suggest that one of the two attorneys in a capital defense case be designated and act as the lead counsel. *ABA Guidelines* 2.1 cmt. at 41. But *ABA Guidelines* are not controlling; they are only a guide as to what reasonable means, not a definition. *Bobby v. Van Hook*, 558 U.S. 4, 8, 130 S. Ct. 13, 175 L. Ed. 2d 255 (2009) (Court of Appeals improperly treated *ABA Guidelines* not merely as evidence of what reasonably diligent attorneys would do but as inexorable commands with which all capital defense counsel must fully comply). Under

27

*Strickland*, the relevant inquiry regarding deficient performance remains whether counsel's conduct fell outside the range of reasonable professional conduct. *Strickland*, 466 U.S. at 688-89.

Here, Cross argues unconvincingly that the failure to appoint lead counsel amounted to deficient performance. To support this contention, Cross offers a single attorney's tentative opinion that failure to appoint a lead counsel, coupled with apparent lack of adequate supervision, "seems to have compromised the preparation of the defense in this case." However, we find that failure to designate a lead counsel in the case did not result in ineffective representation because both counsel were sufficiently qualified to represent Cross. Moreover, the division of labor between Larranaga and Warner was reasonable. In general, Larranaga worked on the legal issues and handled expert witnesses; Warner tended to work on social and psychological issues.

Nor has Cross demonstrated prejudice. The trial court lauded counsel's performance with respect to preparation, advocacy on behalf of Cross, quality of briefing, and legal and analytical skills. Counsel was judged to be "thoroughly and completely competent." There is no evidence that appointing a lead counsel would have rendered a more favorable outcome for petitioner. Thus, we reject Cross's claim of ineffective assistance of counsel for failure to appoint lead counsel.

*E. Failure To Conduct a Thorough Pretrial Investigation*

Cross claims that counsel failed to conduct a thorough pretrial factual investigation. Specifically, Cross argues that the defense team should have hired additional investigative help and located certain witnesses. Both claims fail.

Trial counsel did hire additional investigative help. Just two weeks after the murders, they hired a mitigation specialist, Teresa McMahill, who had ample experience with capital cases. In any case, Cross cannot show resulting prejudice. There is no evidence that hiring additional investigative help would have resulted in the discovery and admission of mitigating or exculpatory evidence.

Cross also argues that counsel's investigation was deficient because the investigation team failed to locate several important witnesses, specifically (1) Dr. Robert Thompson, a psychiatrist who treated Cross from 1995 to 1997; (2) Dr. Grindlinger, a psychiatrist who treated Cross in the 1980s while Cross was residing in Pennsylvania; and (3) Carl Watt, Cross's brother.

This claim fails because counsel did locate the two doctors and incorporated information obtained from them into expert witness testimony for the defense. A defense investigator spoke with Dr. Thompson early in the proceedings, and Dr. Thompson sent the defense his handwritten treatment notes of Cross. In addition, the court reviewed records from Cross's 1988 commitment to Divine Providence Hospital in Pennsylvania where Dr. Grindlinger was the treating psychiatrist. At Cross's competency hearing, Dr. Hart testified that he had reviewed records from Pennsylvania before coming to the conclusion that Cross was competent. This implies that defense counsel knew of the doctors and made reasonable efforts to obtain relevant information from them.

Moreover, the decision not to call Drs. Thompson and Grindlinger falls within the province of tactical decisions by defense counsel. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 900, 952 P.2d 116 (1998) (counsel is not required to call all available

29

witnesses); *see also In re Pers. Restraint of Davis,* 152 Wn.2d at 742 (decision whether to call a witness generally presumed to be a matter of trial strategy or tactics); *State v. Mannering,* 150 Wn.2d 277, 287, 75 P.3d 961 (2003) (decision not to call defense expert witness was trial tactic). This is especially true because defense counsel ultimately presented related testimony. Thus, deciding not to call two doctors whose testimonies would likely have been redundant was a strategic choice.

In any case, there was no prejudice. The trial court reviewed Cross's psychiatric evaluations from the late 1980s and mid-1990s before finding Cross competent to plead guilty. And there was no prejudice with regard to the death sentence because the sentencing jury heard Drs. Thompson's and Grindlinger's evaluations and experts at trial explained the evidence. Notably, Dr. Grindlinger averred that he "had no independent recollection" of his work with Cross outside of the written evaluations. In other words, anything to which Dr. Grindlinger would have testified was contained in his reports. Thus, Cross fails to show that counsel was ineffective for failing to locate and interview Drs. Thompson and Grindlinger.

Nor was it ineffective not to call Carl Watt to testify, and in any event we find no resulting prejudice. Speculation that Carl "might have been helpful" or that he "may possess important information regarding Mr. Cross's development and mental health issues" does not meet the standard for personal restraint petitions. Cross fails to show that had attorneys called Carl as a witness, Carl would likely have provided competent, admissible evidence establishing facts that would require relief. *In re Pers. Restraint of Pirtle,* 136 Wn.2d 467, 473, 965 P.2d 593 (1998).

Cross's defense team, which consisted of two attorneys, two investigators, and a mitigation specialist, conducted prompt and adequate investigation in this case. This is unlike cases in which almost no work was done to develop mitigation evidence. *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 523-46, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (counsel's failure to adequately investigate prior to deciding not to introduce mitigating evidence in capital case constituted ineffective assistance); *Williams v. Taylor*, 529 U.S. 362, 395-96, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (investigation for mitigation began one week before trial; there was no effort to seek records because the attorney erroneously believed them to be inadmissible); *Silva v. Woodford,* 279 F.3d 825, 838-40 (9th Cir. 2002) (attorney refused to investigate mitigating factors because there was a threat of misbehavior from defendant); *State v. Jury*, 19 Wn. App. 256, 264, 576 P.2d 1302 (1978) (counsel made virtually no factual investigation of the events leading to defendant's arrest, nor did he properly support either his motion for continuance or motion for new trial with any affidavits). Here, the trial court commended counsels' investigative efforts: "Current counsel have thoroughly investigated and explored all potential evidence, witnesses, and mitigation." Furthermore, at trial, Cross expressed "no dissatisfaction with the quality or preparedness of his counsel, or with the avenues of mitigation they had explored."

Accordingly, we find that the investigation team was adequately comprised to handle the task and their investigation was reasonable under the *Strickland* standard. We reject Cross's claim of ineffective assistance of counsel for failure to hire additional investigative help and failure to locate specific witnesses.

F. *Conceding the Admissibility of Cross's Custodial Statements to Detective Doyon*

Petitioner claims that trial counsel were ineffective when they conceded the admissibility of Cross's tape-recorded statements to Detective Doyon. We reject this claim because allowing Cross's taped statement into evidence was a legitimate trial tactic. As the State points out, the taped statement provided defense counsel with evidence of several mitigating circumstances: Cross's (1) lack of planning, (2) remorse, and (3) prior incidents of domestic violence between Cross and Anouchka.

Indeed, the taped statement showed lack of planning. When Doyon asked Cross what happened, Cross replied, "Ah, I just flipped out, man." The interview also explored how events in Cross's life were spiraling out of control—his oldest son was in prison, he was under a tremendous amount of financial strain, and the day before the murders he learned that his daughter had just broken up with her husband. Cross stated, "I'm goin' nuts. I just can't take it." When Doyon asked if he had planned the murders, Cross responded, "It just came out." Thus, during the interview, Cross admitted to the murders but denied premeditation and planning. Defense counsel also used the tape to show Cross's remorse. Last, during the interview, Cross denied any previous domestic violence incidents other than slapping Anouchka the night before the murders. Thus, we find that it was not deficient performance for trial counsel to concede admissibility of the tape-recorded statements.

In addition, Cross cannot show prejudice. There is no evidence that he would have withdrawn his guilty plea had the statements not been admitted. And the core issue during the penalty phase was whether there were sufficient mitigating factors to

warrant mercy. Compared with the gruesome nature of the attacks, the interview painted Cross in a relatively harmless way.

### G. Failing To Inform the Judge at the Competency Hearing That Cross Was Brain-Injured

Cross claims that defense counsel was prejudicially ineffective for failing to inform the judge at the time of his competency hearing that Cross had suffered brain injury. This claim fails because the judge was informed of Cross's medical conditions before finding him competent to stand trial, withdraw his not guilty by reason of insanity (NGI) plea, and enter his *Alford* plea.

The judge was fully aware of Cross's mental condition. Cross's defense counsel properly raised the issue of Cross's competency early on in the proceedings. The trial judge ruled that Cross could be evaluated by an expert of his choosing and by Western State Hospital. Subsequently, Dr. Hart (a Western State psychologist), Dr. Gage (a Western State psychiatrist), and Dr. Muscatel (a defense psychologist) met with Cross for over an hour to determine whether Cross was competent to proceed, with special emphasis placed on his understanding of the legal proceedings before him and his ability to assist his counsel with defense. All three doctors additionally reviewed Cross's prior medical history and concluded that Cross was competent.[16]

---

[16] Dr. Hart testified that Cross understood the charges against him. He opined that although Cross had some difficulty remembering certain details about the murders, limited amnesia of that sort is not a critical part of legal competency. Cross was not insane, he was not psychotic, and he was not depressed enough to interfere with his competency. He understood the seriousness of the death penalty. Dr. Muscatel also reviewed Cross's records and then met

The judge learned specifically about the brain injury Cross suffered as a result of his suicide attempt very early in the proceedings. And at the competency hearing, the judge reviewed all of Cross's medical records, including records pertaining to his brain injury.[17] Thus, we find no deficient performance because defense counsel informed the court of Cross's potential incompetence due to a brain injury and no prejudice because Cross was properly adjudged competent.

Cross next claims that failure to notify the judge of a childhood brain injury was ineffective assistance of counsel because it led to the judge failing to comply with RCW 10.77.060(1)(b). This claim also fails because there is no prejudice. The judge was not required to appoint a developmental disabilities professional under the statute because there was no evidence that Cross suffered from a developmental disability.[18] A developmental disability must originate before an individual turns 18 and must be "attributable to intellectual disability, cerebral palsy, epilepsy, autism, or another

---

with Cross for about 75-90 minutes. He opined similarly that Cross was competent to stand trial and to enter his *Alford* plea.

[17] Records included Cross's 1988 treatment records from Divine Providence Hospital in Williamsport, Pennsylvania; a 1988 psychological assessment performed by Dr. Keeley; tests administered by Dr. Keeley; a psychiatric evaluation by Dr. Grindlinger; progress notes from Divine Providence Hospital and a discharge summary; psychological reports by Doctors Wheeler, McClung, Woods, and Young; transcripts of the telephonic interview with psychologist Dr. Murray Hart; Cross's current Rorschach testing and his Minnesota Multiphasic Personality Inventory plus the raw data; and Cross's 1995 to 1997 treatment records from Dr. Thompson.

[18] According to the statute, when a defendant enters an NGI defense or when there is evidence that calls into question the defendant's competency, the judge must appoint an expert to evaluate and report on the mental condition of the defendant. Specifically, if any party advises the court that the defendant may be developmentally disabled, at least one of the experts or professional persons shall be "a developmental disabilities professional." RCW 10.77.060(1)(b).

34

neurological or other condition of an individual found by the secretary to be closely related to an intellectual disability." RCW 71A.10.020(4). Here, evidence of Cross's alleged childhood brain injury resulting from a high fever was inconclusive. And notably, the defense conceded that Cross did not suffer from an intellectual disability. Thus, Cross was not prejudiced by the failure to invoke the procedures set forth in RCW 10.77.060(1) because the statute does not apply where the defendant is not developmentally disabled.

Cross also argues that trial counsel provided ineffective assistance by failing to seek additional neuropsychological testing. Following his first suicide attempt, Harborview Medical Center performed magnetic resonance imaging and X-rays on Cross's neck, as well as computed tomography scan on his head. And it was Cross who refused to allow Harborview Medical Center to conduct further neurological testing (beyond the initial screening tests) to ascertain whether he suffered any cognitive deficits. Thus, we find that defense counsel timely apprised the trial court of Cross's mental health history, causing the trial court to further investigate Cross's intellectual abilities to the extent permitted by Cross. After an extensive inquiry, the trial court found Cross was competent to withdraw his NGI plea, enter an *Alford* plea, and stand trial. Thus, we reject this ineffective assistance of counsel claim.

### H. Failing To Advise Cross of Consequences of Entering an Alford Plea

Cross claims that it was ineffective assistance of counsel when his attorneys failed to affirmatively advise him or failed to request rulings that would have apprised him of consequences of entering an *Alford* plea—omissions that might have affected Cross's decision to enter an *Alford* plea. Specifically, Cross claims his counsel should

35

have advised him that entering an *Alford* plea (1) would preclude him from challenging premeditation and "common scheme or plan" and (2) would not preclude counsel from presenting mental health evidence over Cross's objection.

The *Strickland* test applies to claims of ineffective assistance of counsel in the plea process. *In re Pers. Restraint of Peters,* 50 Wn. App. 702, 703, 750 P.2d 643 (1988) (citing *Hill v. Lockhart,* 474 U.S. 52, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985)). In the context of a guilty plea, the defendant must show that counsel failed to substantially assist him in deciding whether to plead guilty and that but for counsel's failure to properly advise him, he would not have pleaded guilty. *State v. McCollum,* 88 Wn. App. 977, 982, 947 P.2d 1235 (1997).

Here, Cross's claims fail because there is no evidence that Cross would have refused to enter his *Alford* plea; the trial court properly found that Cross's plea was voluntary, intelligent, and knowingly given. *In re Pers. Restraint of Cross*, 178 Wn.2d at 529-30. Notably, Cross has never moved to withdraw his plea. Thus, we reject these ineffective assistance of counsel claims.

### I. Allowing Cross To Make an Inconsistent Statement to the Court when Entering His Alford Plea

Cross also argues counsel was ineffective when they allowed him to make a false statement to the court contemporaneous with his *Alford* plea. It is not clear whether Cross was insincere or truthful when he stated that he believed there was a substantial likelihood that a jury would find him guilty of premeditated murder. But, even assuming that Cross lied to the court, we find no deficient performance because

a reasonably competent attorney would not have known with sufficient certainty that Cross was lying under the circumstances.

A mandatory duty to withdraw, disclose, or take other steps arises only when the lawyer "knows" that the client intends to or did commit perjury. Ethics opinions suggest that lawyers should have a high degree of certainty before acting on client perjury. ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Ethics Op. 87-353 (1987) (lawyer should know that client intends to commit perjury from client's stated intention and not based on mere suspicion); Ethics Advisory Comm. of Nat'l Ass'n of Criminal Defense Lawyers, Formal Ethics Op. 92-2 (adopted Nov. 7, 1992) (criminal defense lawyer should not act on belief that client intends to commit perjury unless lawyer knows this to be so beyond reasonable doubt). A mere inconsistency in the client's story or between two proffered defenses is generally insufficient to conclude that the client will offer false testimony. *See Nix v. Whiteside*, 475 U.S. 157, 190-91, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986); *Johnson v. United States*, 404 A.2d 162, 164 (D.C. 1979) (mere fact that defendant's intended trial testimony was inconsistent with his prior statements was insufficient to establish that defendant's testimony would be perjurious). In addition, to avoid undermining the relationship of trust and confidence between a lawyer and the accused, the lawyer should generally resolve doubt in favor of the client. *See* Randolph N. Stone, *Between a Rock and a Hard Place: Responding to the Judge or Supervisor Demanding Unethical Representation, in* ETHICAL PROBLEMS FACING THE CRIMINAL DEFENSE LAWYER, 1, at 10 (Rodney J. Uphoff ed., 1995).

Here, Cross's attorneys properly resolved doubt in favor of Cross. That is, they chose to believe Cross when he said he believed there was a substantial likelihood that a jury would find him guilty of premeditated murder. There is no evidence that Cross had indicated to his attorneys an intent to lie prior to making the statement. It is entirely plausible that Cross simply had a change of heart. Larranaga's belated assessment that Cross would have "said whatever he needed to say in order to have the plea accepted" is speculation and tainted by hindsight. Thus, allowing Cross to make the statement did not fall below an objective standard of reasonableness.

In addition, there is no resulting prejudice because a judge may accept an *Alford* plea if the plea is made voluntarily, competently and with an understanding of the nature of the charge and the consequences of the plea, and if the judge is satisfied that there is a factual basis for the plea. *In re Pers. Restraint of Cross*, 178 Wn.2d at 521. Whether a plea was voluntarily and competently made depends on multiple sources of evidence. In *In re Personal Restraint of Cross*, *id.* at 529, this court considered Cross's other statements on his plea, the extensive colloquy between Judge DuBuque and Cross when he entered his plea, and the fact that Cross admitted to killing the three women to conclude that his *Alford* plea was properly admitted. In other words, even if Cross did lie about his belief in that one moment, that by itself does not invalidate his *Alford* plea given his other statements on the record. There is no prejudice, and we reject this ineffective assistance of counsel claim.

*J. Failing To Argue Lack of Premeditation and Common Scheme or Plan*

Cross claims that trial counsel provided ineffective assistance of counsel when they ignored his desire to challenge premeditation and instead conceded premeditation in opening argument and at trial. He also claims that it was prejudicially ineffective for counsel to fail to argue lack of common scheme or plan.

We find that counsel did argue to the jury that Cross lacked premeditation. *Cross*, 156 Wn.2d at 601, 604 (noting that Cross argued extensively that he lacked premeditation). In his opening statement, defense counsel read Cross's guilty plea where he admitted to the killings but maintained that he acted without premeditated intent. Later, defense counsel argued that Cross did not plan the murders—that he exploded in anger, had no list, made no effort to escape, packed no bags, and stashed no money. Although planning and premeditation stand for different degrees and manner of forethought, many of Cross's arguments about preplanning approximated an argument that he lacked premeditation.

Likewise, counsel argued lack of common scheme or plan. For example, Cross's *Alford* plea stated that Cross did "not believe that the three murders were part of any common scheme or plan or the result of a single act." Moreover, evidence that Cross did not plan often demonstrated lack of a common scheme or plan—if the murders were spontaneous, there could be no scheme or plan. Thus, Cross's claim of ineffective counsel fails because counsel did argue lack of premeditation and common scheme or plan; there was no deficient performance.

### K. Failing To Argue the Brain Injury Evidence

Cross also argues that counsel's failure to develop evidence of his childhood brain damage was both deficient and prejudicial because it could have been "powerful" mitigation evidence. We hold that there was no deficient performance because counsel had no obligation to argue the childhood brain injury evidence. Although defense counsel must initiate reasonable evaluation of a defendant's mental condition when there is a question as to the defendant's competency, there is no duty to argue specific injuries. This is especially true here because evidence of Cross's alleged childhood brain injury resulting from high fever was inconclusive. Trial counsel was unable to locate any medical records suggesting Cross suffered from brain damage at the time he committed the murders. In fact, the state's investigation indicated that Cross's brain injury was more likely the result of Cross's jail suicide attempt. Thus, counsel could reasonably have made a strategic determination to focus on other mitigating evidence. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (performance not deficient when counsel's conduct can be characterized as legitimate trial strategy).

Also, we find no prejudice because Cross cannot show that there is a reasonable probability the outcome would have been different had counsel argued the brain injury. As discussed, the childhood brain injury evidence was scant and uncertain. There is no evidence that the jury would have accepted this as proof of a mitigating circumstance. Accordingly, we reject this ineffective assistance of counsel claim.

## L. Objecting To Appointment of Independent Counsel

Cross argues that his trial counsel was prejudicially ineffective for objecting to appointment of independent counsel. This issue was rejected on direct appeal and is, thus, procedurally barred.

On direct appeal, Cross argued that the trial court erred in denying his motion for appointment of independent counsel. *Cross*, 156 Wn.2d at 605. We held that the conflict between Cross and his attorneys did not amount to violation of Cross's right to counsel and the trial court did not commit error when it failed to appoint independent counsel. *Id.*

Cross now argues that defense counsel's objection to appointment of independent counsel constitutes ineffective assistance of counsel. Cross contends that there was an irreconcilable conflict between himself and trial counsel. Cross did not want to present any evidence of his mental health; trial counsel did, feeling that it would be Cross's strongest defense. This was the same conflict complained of on direct appeal. What was formerly a substitution of counsel issue has been recast as a claim that objection to appointment of counsel was ineffective assistance of counsel. Because identical grounds for relief can be supported by different legal arguments or couched in different language, simply recasting an argument in this manner does not create a new ground for relief or constitute good cause for reconsidering a previously rejected claim. *In re Pers. Restraint of Benn,* 134 Wn.2d at 906 (citing *In re Pers. Restraint of Jeffries,* 114 Wn.2d 485, 488, 789 P.2d 731 (1990)). Cross may not re-raise this issue. *In re Pers. Restraint of Davis,* 152 Wn.2d at 671; *In re Pers. Restraint of Lord,* 123 Wn.2d 296, 303, 868 P.2d 835 (1994).

Even if Cross was not barred from making this claim, Cross's claim would still fail because there was no deficient performance. We held on direct appeal that independent counsel was not necessary. *Cross*, 156 Wn.2d at 605. So, objecting to appointment of independent counsel was not unreasonable. Indeed, as the State points out, there appear to have been legitimate tactical reasons to oppose the appointment. Inserting a new lawyer into the case could have exacerbated the rift between Cross and his counsel. Also, the two trial attorneys had already worked with Cross for almost two years when the issue of independent counsel arose; it would have been time consuming to update new attorneys on all of the mitigation evidence. Counsels' belated realizations—that they made a mistake opposing the appointment—are tainted by hindsight and cannot serve as a basis for evaluating actions at the time they were executed.

Thus, we reject petitioner's claim that objecting to appointment of independent counsel amounted to ineffective assistance of counsel because it is procedurally barred and because it fails on the merits.

*M. Presenting the Gun Ownership Evidence*

Cross argues that counsel was prejudicially ineffective for eliciting unfairly prejudicial testimony of gun ownership. He argues that because the *prosecution* was barred from offering evidence of Cross's constructive possession of guns, *defense counsel's* affirmative introduction of this evidence constituted deficient performance. This claim rests on an improperly broad reading of *State v. Rupe*, 101 Wn.2d 664, 683 P.2d 571 (1984).

42

In *Rupe*, 101 Wn.2d at 704, we explained that because gun ownership is constitutionally protected behavior, it "cannot be the basis of criminal punishment." It follows that the "*State* can take no action which will unnecessarily 'chill' or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right." *Id.* at 705 (emphasis added) (quoting *United States v. Jackson*, 390 U.S. 570, 581, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968)).

*Rupe* does not apply here because it was not the State who introduced allegedly irrelevant and prejudicial evidence of gun ownership, but the defense. During the penalty phase, defense counsel elicited testimony from Detective Gulla that officers had recovered a shotgun and a rifle in Cross's master bedroom. Thus, we hold that there is no *Rupe* violation; the right to due process applies only when state action deprives an individual of a liberty or property interest. *See Cross*, 156 Wn.2d at 601; *Bang D. Nguyen v. Dep't of Health, Med. Quality Assurance Comm'n*, 144 Wn.2d 516, 522-23, 29 P.3d 689 (2001).

Moreover, the introduction of the gun ownership was a reasonable trial tactic designed to emphasize how little planning Cross put into the murders. That is, if Cross had planned, he might have used the guns. It was not unreasonable or deficient for defense counsel to overlook *Rupe* in deciding to present the gun evidence to show lack of planning.[19] We reject petitioner's claim that counsel was prejudicially ineffective for eliciting the testimony of gun ownership.

---

[19] Petitioner argues that strategic decisions are entitled to deference only if they are "made after thorough investigation of law and facts." *Strickland*, 466 U.S. at 690-91. And if such investigations are less than complete, strategic choices are reasonable "precisely to the

*N. Eliciting Testimony Regarding D.J. Watt's Jail Time*

Cross argues that counsel was prejudicially ineffective for undermining D.J. Watt's credibility by bringing up his criminal history and for failing to object when the State further questioned D.J. Watt about his jail time. This claim fails because counsel could have reasonably decided to elicit testimony that D.J. Watt was arrested to show Cross's stressors leading up to the murders, and there was no prejudice.

On direct examination, defense counsel elicited testimony from Cross's son, D.J. Watt, that D.J. was in jail in 1995 and that he was arrested while living with his father in 1998. Petitioner argues that there appears to be no strategic reason for calling forth this testimony, and this allowed the prosecution to discredit D.J. by twice emphasizing the fact that D.J. was in prison.

Petitioner's claim fails because counsel could have reasonably decided to elicit testimony that D.J. Watt was arrested to show that Cross was under a lot of stress. It appears that one of the defense strategies was to show that Cross cycled through periods of depression and psychosis, leading to violence. Thus, there was no deficient performance.

Moreover, there was no prejudice. On cross-examination, the prosecutor asked D.J. how he learned that Cross had murdered his family. D.J. replied, "A parole officer called and told me." We agree with the State that this answer is confusing because a "parole officer" is a state official who supervises someone in the community. In fact, D.J. was in jail at the time. Thus, the prosecutor simply asked D.J. to clarify where he

extent that reasonable professional judgments support the limitations on investigation." *Id.* Here, defense counsel's investigations into the law were not lacking.

was when he learned about the murders. Prosecutors did not unduly focus on D.J.'s criminal record. Thus, we reject petitioner's claim that counsel was prejudicially ineffective for bringing up the D.J. Watt's criminal history.

*O. Eliciting Testimony Regarding Cross's Uncharged Acts of Domestic Violence*

Cross claims that counsel was prejudicially ineffective for (1) failing to make a record of the side bar conference where the trial court ruled on the admissibility of domestic violence evidence and (2) affirmatively eliciting testimony from Crystal Watt and D.J. Watt regarding Cross's prior acts of domestic violence. Both of these claims fail because the trial court properly ruled that this evidence was admissible.

Prior to calling Crystal Watt to testify, the judge held a sidebar conference to determine the scope of permissible cross-examination of Crystal Watt. There is no record of this sidebar aside from some cursory notes by the judge. As a result of discussions at sidebar, the trial judge ruled that the prosecution could cross-examine Crystal regarding acts of domestic violence against Cross's first wife, Irene. Petitioners now argue that had trial attorneys made a record of their objections at sidebar, Cross could have successfully challenged the trial court's ruling on direct appeal.

Petitioner's claim fails; there is no deficient performance. At least one Washington appellate court has reasoned that "[j]ust as an appellate lawyer is not considered ineffective for failing to raise every conceivable non-frivolous claim of error, a trial lawyer cannot be faulted for failing to make a record of every such allegation." *City of Tacoma v. Durham*, 95 Wn. App. 876, 882, 978 P.2d 514 (1999). Thus, Cross's

trial lawyers did not fall below the standard of reasonableness by failing to make a record of the sidebar conference.

In any case, there was no resulting prejudice because the trial court properly admitted the domestic violence testimony as rebuttal evidence. We have held that because of its unreliability, evidence of uncharged crimes is not permitted in the State's case in chief. *State v. Bartholomew*, 101 Wn.2d 631, 641, 683 P.2d 1079 (1984) *(Bartholomew II)* (quoting *State v. Bartholomew*, 98 Wn.2d 173, 196-97, 654 P.2d 1170 (1982) *(Bartholomew I)*, *vacated on other grounds by* 463 U.S. 1203, 103 S. Ct. 3530, 77 L. Ed. 2d 1383 (1983), *aff'd on remand by Bartholomew II*). But during a special sentencing proceeding, the prosecution may offer rebuttal evidence if it is "relevant to a matter raised in mitigation by the defendant" and "'the rebuttal value of the evidence outweighs the prejudicial effect.'" *State v. Lord,* 117 Wn.2d 829, 891-92, 822 P.2d 177 (1991) (quoting *Bartholomew II*, 101 Wn.2d at 643).

Here, the domestic violence evidence tended to rebut mitigation evidence that Cross was a good person. Crystal testified that Cross could "be a good guy" and "a good person." Testimony that Cross regularly hit his wife and children rebutted these assertions. *Cf. Lord*, 117 Wn.2d at 893-94 (testimony that Lord failed to follow terms of his probation and had eluded police directly rebutted Lord's father's testimony that Lord was a "'good boy'"); *State v. Brett*, 126 Wn.2d 136, 189, 892 P.2d 29 (1995) (testimony regarding Brett's uncharged criminal activities admissible because it rebutted testimony that Brett "'respected people'" and "'was a gentleman'"). This testimony also rebutted Cross's claim that his 1988 reckless endangerment conviction was an isolated event associated with psychosis.

Moreover, there is no prejudice because defense used this testimony to show that Cross cycled in and out of violence, triggered by stress and depression. *See State v. Vy Thang,* 145 Wn.2d 630, 647-48, 41 P.3d 1159 (2002) (generally, parties may not favorably rely on evidence and then assign its use as error). For instance, Crystal Watt testified on direct that when Cross was verbally and physically abusive, he also showed signs of depression—i.e., he did not leave the house for years, put blankets on the windows, wore dark sunglasses indoors, and paced back and forth all night. The testimony regarding domestic violence was not cumulative or graphic in nature. It did not describe acts overly similar to the crime being charged. Also, the jury was aware of Cross's 1988 reckless endangerment conviction, which was far more prejudicial because that incident involved Cross assaulting his wife with a knife. On balance, testimony concerning Cross's familial interactions, including acts of domestic violence, was relevant and necessary to give the jury a complete picture of Cross. Thus, we find that the prejudicial effect of the challenged testimony was outweighed by its probative value as rebuttal evidence; the evidence was properly admitted under *Bartholomew.*

Cross's second related claim is that counsel was prejudicially ineffective for questioning Crystal and D.J. Watt about Cross's prior acts of domestic violence. This claim also fails. Once the trial court properly ruled that the prosecution could cross-examine Crystal Watt regarding Cross's acts of domestic violence, defense counsels' decision to partially defuse the subject by bringing it up on direct examination is best characterized as a trial strategy. Thus, we reject this claim. We also hold that it was not ineffective assistance of counsel to fail to object when the prosecutor cross-

examined the witnesses about Cross's acts of domestic violence because the trial court had already ruled this line of questioning was proper.

P. *Eliciting Testimony That Cross Had Quit His Job To Avoid Paying Child Support*

Cross argues that counsel was prejudicially ineffective for disclosing that Cross had quit his job to avoid paying child-support. This claim fails because introducing this evidence was a reasonable trial tactic—it showed Cross's stressors leading up to the murders.

Evidence of mounting child support payments was relevant to Cross's mental state leading up to the murders. Indeed, in opening statement, trial counsel presented a theory of Cross's deterioration, outlining myriad reasons for Cross's downward spiral: bouts of domestic violence with his first wife, Irene; in-patient psychiatric treatment; a divorce from Irene; custody battles over their two children; the death of his mother; his second marriage failing; and the financial strain he was in due to his child-support obligations. The overall strategy was to show that Cross's stressors were cyclical—and the cycle that began in late 1996 exploded in the unplanned murders of Cross's wife and two of his step-daughters. This was a legitimate trial tactic because at least one juror may have sympathized with Cross's overall plight, exacerbated by intense financial stress, and spared him the death penalty.

Also, it is effective advocacy to anticipate adverse testimony by introducing it first. *See Thang*, 145 Wn.2d at 646-48. Here, defense counsel tried to exclude or limit evidence of Cross's child support obligations. The trial court ruled that the evidence was relevant and admissible. Thus, counsel made a legitimate tactical

decision to use the evidence to show Cross's frustration and stress leading up to the murders. We reject petitioner's claims that counsel was prejudicially ineffective for proactively eliciting testimony that Cross quit his job to avoid paying child support.

Q. *Failing To Object, Ask for a Curative Instruction, or Move for Mistrial when the State Elicited Opinions from Experts That Cross Malingered*

Cross claims that trial counsel was prejudicially ineffective for failing to object, ask for a curative instruction, or move for mistrial when the prosecutor elicited opinions from mental health experts that Cross might be malingering his psychotic symptoms. We hold that there was no deficient performance.

Because malingering is generally beyond the ordinary understanding of lay persons, it is a proper subject for expert opinion. *See Johnson v. Weyerhaeuser Co.*, 134 Wn.2d 795, 803, 953 P.2d 800 (1998) (malingering can be established through expert and nonexpert opinion). Expert opinions and the basis for these opinions are admissible if they are helpful to the trier of fact. *State v. Ellis*, 136 Wn.2d 498, 517, 963 P.2d 843 (1998); ER 702. Here, an opinion whether Cross was malingering helped the jury to determine if there were sufficient mitigating circumstances (mental disturbance) to merit leniency. Thus, the prosecutor could properly question experts on whether Cross malingered, and it was not unreasonable for defense counsel to allow it.

Furthermore, defense counsel brought up the issue of malingering so the state was permitted to respond and present rebuttal evidence. *See, e.g., State v. Gentry*, 125 Wn.2d 570, 642-44, 888 P.2d 1105 (1995) (rebuttal provoked by defense counsel's own use of a biblical analogy). Defense counsel first presented evidence

that Cross did not malinger through Dr. Young's testimony. In response to Dr. Young's testimony, state experts, based on independent examinations of Cross, testified that Cross likely malingered. Thus, we find that the prosecutor fairly responded to defense counsel's presentation of a mitigating factor (extreme mental disturbance). Defense counsel was not ineffective for failing to object when the prosecutor elicited testimony that Cross malingered because the prosecution's questions were not objectionable.

Moreover, there was no resulting prejudice. There was evidence that Cross malingered; Cross himself testified that he lied to doctors. Moreover, the jury was instructed that they were not bound by expert opinions and were, thus, free to decide for themselves, based on all of the evidence, whether Cross malingered. Thus, we hold there was no prejudice and we reject this ineffective assistance of counsel claim.

*R. Failing To Request Certain Jury Instructions*

In order to find that Cross received ineffective assistance of counsel based on the trial counsel's failure to request a jury instruction, this court must find that Cross was entitled to the instruction, that counsel's performance was deficient in failing to request the instruction, and that the failure to request the instruction prejudiced Cross. *See State v. Cienfuegos,* 144 Wn.2d 222, 227, 25 P.3d 1011 (2001).

1. Instruction That Jurors May Consider Whether There Was Premeditation

First, Cross claims that counsel was prejudicially ineffective for failing to request an instruction that jurors could consider whether there was premeditation. On direct appeal, we left open the issue of whether it was ineffective assistance of counsel to fail to request this instruction. We acknowledged that "a law abiding jury might not have felt it could question an element of the underlying crime to which Cross pleaded

guilt[y] as a mitigating factor." *Cross*, 156 Wn.2d at 605 n.6. Lack of premeditation was central to Cross's defense. Indeed, Cross explicitly denied premeditating the murders in his *Alford* plea and consistently maintained that he did not deserve, the death penalty because he did not premeditate the killings. Thus, we find that it was deficient performance for counsel to fail to request this instruction because a reasonable attorney would have recognized that jurors would not feel free to disregard an element of a crime to which Cross pleaded guilty.

We also find that if Cross's attorneys had requested the instruction, it would likely have been given in light of the uncertainty surrounding the distinction between premeditation and planning,[20] and given that the trial court told Cross he could continue to argue lack of premeditation notwithstanding his entering an *Alford* plea. *State v. Washington*, 36 Wn. App. 792, 793, 677 P.2d 786 (1984) (defendant is entitled to jury instruction supporting his theory of the case if there is substantial evidence in the record supporting his theory).

However, there is no prejudice because Cross cannot show a reasonable probability that he was harmed. We explained on direct appeal that Cross could and

---

[20] It is not entirely clear whether Cross truly understood the difference between premeditation and planning. For instance, during the plea colloquy, the trial court asked if Cross understood the difference between premeditation as an element of first degree murder and planned acts. Cross responded, "That I planned. And premeditate doesn't necessarily mean—for premeditated, you have to sit there and plan it out for a long period of time." From this, it seems Cross did not understand what premeditation was. At other times, however, Cross seemed to understand that planning demands a greater degree of forethought. For example, Cross believed he had a good chance the jury would not sentence him to death because he had not planned—i.e., extensively plotted out—the murders. The terms "planning" and "premeditation" were used interchangeably at trial at critical moments. But as we explain, Cross could and did argue both lack of planning and premeditation, so there was no prejudice.

did present evidence of lack of premeditation and that under the instructions given, jurors had an adequate vehicle for considering the evidence because they were broadly instructed to consider all mitigating factors. *Cross*, 156 Wn.2d at 604. And even assuming the jury did not feel it could consider evidence that Cross did not premeditate, they could consider evidence that he did not plan, which was also mitigating. Thus, Cross cannot show that failure to request this instruction prejudiced him.

2. Instruction To Explain the Nature and Effect of an *Alford* Plea

Second, Cross claims that counsel was prejudicially ineffective for failing to request an instruction to explain the nature and effect of an *Alford* plea. This was not ineffective assistance of counsel because there was no prejudice. Both parties at trial referred to the *Alford* plea as a guilty plea, and defense counsel used the fact that Cross entered a "guilty plea" to show that he was taking responsibility for his actions. It would not have helped Cross for the jury to know that technically, a defendant who enters an *Alford* plea does not acknowledge guilt but instead merely concedes there is sufficient evidence to support a conviction. This tends to refute defense counsel's argument that Cross was taking responsibility for his actions. Moreover, there is no evidence that the jury misunderstood what an *Alford* plea was or that an explanatory instruction would have changed their decision. Thus, there was no prejudice.

We also find that no prejudice resulted from counsel's failure to make a motion in limine to preclude argument regarding the form of Cross's plea because the State never argued the form of the plea. The State argued that the actual language of the plea—"I do not believe I acted with premeditated intent. I also do not believe that the

three murders were part of any common scheme or plan or the result of a single act"— suggested that Cross did not accept responsibility for his crimes. And even if this amounted to arguing the form of the plea, there is no evidence that making the motion would have changed the outcome of the case. Defense argued several mitigating factors, and the jury rejected all of them.

3. Instruction That Jurors May Not Consider the Cost of Medical Care when Deciding Whether to Impose the Death Penalty

Third, Cross claims that counsel was prejudicially ineffective for failing to request an instruction that jurors could not consider the cost of medical care when deciding whether to impose the death penalty. This claim fails because there is no evidence that the jury considered medical costs when they decided to impose the death penalty. Indeed, the jurors were instructed that they should impose the death penalty only if they were convinced beyond a reasonable doubt that there were not sufficient mitigating circumstances. The mitigating circumstances listed did not include the cost of lifelong detainment. Cross has not shown a reasonable probability that the jury would have ruled differently had they received such an instruction. Accordingly, we reject Cross's claims that counsel's failure to request certain jury instructions constituted ineffective assistance of counsel.

S. *Failing To Object to or Move To Correct Alleged Errors in Prosecution's Closing Arguments*

Defense counsel's failure to object to a prosecutor's closing argument will generally not constitute deficient performance because lawyers "do not commonly object during closing argument 'absent egregious misstatements.'" *In re Pers. Restraint of Davis,* 152 Wn.2d at 717 (quoting *United States v. Necoechea,* 986 F.2d

1273, 1281 (9th Cir. 1993)). But, this does not mean that all failures to object are decidedly reasonable under *Strickland*. 466 U.S. at 688. If a prosecutor's remark is improper and prejudicial, failure to object may be deficient performance. *Gentry*, 125 Wn.2d at 643-44 (it is prosecutorial misconduct if conduct is both improper and prejudicial).

1. "Guilt Trip" Statements

Cross's first two claims involve prosecutor's "guilt trip" remarks. Both of these claims fail because the statements were not improper and prejudicial. Thus, failure to object was not deficient performance.

It is prosecutorial misconduct for a prosecutor to make any argument that diminishes the juror's sense of personal responsibility in deciding whether to inflict capital punishment. *Caldwell v. Mississippi*, 472 U.S. 320, 329-30, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985). Appellate courts have reversed death sentences where an improper comment in closing argument minimized the jury's role in determining whether to issue a death sentence. *See, e.g., Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995) (statement that defendant would be "put to death instantaneously" minimized the burden of sentencing someone to death by inferring that the death would be painless and easy); *see also Frye v. Commonwealth*, 231 Va. 370, 395 (1986) (death sentence set aside for prosecutorial misconduct where prosecutor told jurors that the "'load is not on your shoulders'").

Here, in closing argument, the prosecutor told jurors, "You can't let the defendant make you feel guilty for the decision he puts you in the position of making." We find that this comment does not minimize the burden of sentencing someone to

death, especially when taken in context. *See Gentry*, 125 Wn.2d at 640 (court must consider context). Immediately prior to making the "guilt trip" statement, the prosecution reminded jurors that their "decision cannot be based on passion or prejudice." Immediately after, the prosecution emphasized that whatever decision the jurors came to "must be based on logic, thoughtfulness, and the use of good common sense." Prosecutors never delegated the responsibility for imposing the death penalty on anyone other than the jury and instead advised jurors that "[the death penalty], because of its severity, should be used sparingly and cautiously." Thus, we hold that the comment, while imprecise,[21] was not improper, and failing to object was not deficient performance.

Petitioner's second claim involves the prosecutor's statement: "[D]on't let the defense guilt trip you because of the immensity of the task . . . . [Y]ou should feel no guilt for being members of the community doing a civic duty. That was a play on your sympathy and emotion." Citing *Viereck v. United States*, 318 U.S. 236, 247, 63 S. Ct. 561, 87 L. Ed. 734 (1943), petitioner argues that this statement was improper because it suggested that by returning a verdict of death, jurors were simply "doing a civic duty."

But, *Viereck* is distinguishable. In his closing remarks to the jury, the prosecutor in *Viereck* "indulged in an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice." *Viereck*, 318 U.S. at 247. In a prosecution for violation of the Foreign

---

[21] Petitioner's argument that it was technically the State who put jurors in this position, because the State has the option of seeking the death penalty, is hairsplitting and misses the point of *Caldwell*.

55

Agents Registration Act of 1938, 22 U.S.C. §§ 611-621, the prosecutor began his closing argument by cautioning jurors that "'this is war'" and that "'there are those who, right at this very moment, are plotting your death . . . ; plotting our death . . . .'" *Id.* at 348 n.3. He continues:

> "It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of a crime, just as much as they are relying upon the protection of the men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.
>
> "As a representative of your Government I am calling upon every one of you to do your duty."

*Id.* The court reasoned that "[a]t a time when passion and prejudice are heightened by emotions stirred by our participation in a great war," there is no doubt that these comments were improper and should have been interrupted by the court without waiting for objection. *Id.* at 248.

By contrast, here, the prosecutor did not implore the jurors to return a death penalty as their civic duty, nor did he make irrelevant comments for the sole purpose of arousing passion and prejudice. Rather, he repeated defense counsel's sentiment regarding the immensity of the task facing the jurors. The statement here does not approach the level of impropriety in *Viereck*. We find that while the prosecutor's statements were a bit unpolished, they were not egregious misstatements and failure to object was not deficient performance.

In addition, there is no resulting prejudice as to both comments. Cross has not demonstrated a reasonable probability that objecting to these remarks would have changed the sentence. The comments were a few lines in a 75-page closing

argument. Thus, we reject Cross's ineffective assistance of counsel claim for failure to object to these "guilt trip" remarks.

2. Suggesting Cross Took Three Lives in Exchange for Life Imprisonment

Cross next takes issue with the statement: "You must consider what Mr. Cross took. What did he take without cause, without justification of right? He took from Anouchka and Solome and Amanda their right to life, liberty and the pursuit of happiness. But all he offers in return is the loss of his liberty." We hold that this was not improper and failure to object was not deficient performance.

A prosecuting attorney has a duty to the public "'to act impartially in the interest only of justice.'" *State v. Monday*, 171 Wn.2d 667, 676 n.2, 257 P.3d 551 (2011). Arguments intended to "incite feelings of fear, anger, and a desire for revenge" that are "'irrelevant, irrational, and inflammatory'" are improper appeals to passion or prejudice. *State v. Elledge*, 144 Wn.2d 62, 85, 26 P.3d 271 (2001) (quoting BENNETT L. GERSHMAN, TRIAL ERROR AND MISCONDUCT § 2-6(b)(2), at 171-72 (1997)); *see State v. Reed*, 102 Wn.2d 140, 147, 684 P.2d 699 (1984) (prosecutor may not make heated partisan comments in order to procure a conviction at all hazards).

The comment at issue here does not rise to the level of impropriety that characterizes improper appeals to passion or prejudice. *Cf. State v. Warren*, 165 Wn.2d 17, 27, 195 P.3d 940 (2008) (stating three times in closing that proof beyond a reasonable doubt "'doesn't mean you give the defendant the benefit of the doubt'"); *Reed*, 102 Wn.2d at 145-46 (prosecutor referred to defendant as a "liar" four times, stated defense had no case, and implied defense witnesses should not be believed because they were from out of town and drove fancy cars); *State v. Powell*, 62 Wn.

57

App. 914, 918, 816 P.2d 86 (1991) (prosecutor stated that verdict of not guilty would send a message that children who reported sexual abuse would not be believed, thereby declaring an "'open season on children'"); *United States v. McRae*, 593 F.2d 700, 706 (5th Cir. 1979) ("'turn him loose, and we'll send him down in the elevator with you and his gun'"). While the suggestion that Cross exchanged three human lives for life imprisonment might incite an emotional response on the part of the jury, it was limited to the circumstances of the crime. *See Brett*, 126 Wn.2d at 214 ("[a]rguments which may evoke an emotional response are appropriate if . . . restrict[ed] . . . to the circumstances of the crime"). Prosecutor's statements were neither flagrant nor ill intentioned. Thus, it was not deficient for counsel to fail to object; we reject this ineffective assistance of counsel claim.

3. Commenting on Expert Testimony

Cross contends also that his counsel was ineffective for failing to object to the prosecutor's statement (1) that neither of the prosecution's two expert witnesses believed that Cross's depression was a legitimate mitigating factor and, on rebuttal, (2) that during defense counsel's closing argument, counsel had put little to no weight in their own experts' testimony.

We find no resulting prejudice arising from prosecutor's opinion that neither of its experts believed Cross's depression was a legitimate mitigating factor. It is true that a witness may not opine whether the proffered evidence provides a "valid" or "legitimate" mitigating factor without invading the province of the jury in the penalty phase of a capital case. *See generally State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987) (experts may not invade province of jury). But here, it is a prosecutor, not

a witness, speaking. And the jury instructions made clear that attorney remarks were not evidence and that the jury should disregard any remark, statement, or argument not supported by the evidence or law as stated by the court. Thus, there was no prejudice.

Cross's second claim also fails. While it is improper for a prosecutor to personally vouch for the credibility of any witness (*Brett*, 126 Wn.2d at 175), merely stating that defense attorneys *appear* to place weight on State expert testimony is not. Also, there is no prejudice because the jurors were told that they are "the sole judges of the credibility of the witnesses and of what weight is to be given the testimony of each." Accordingly, we reject these ineffective assistance of counsel claims.

4. Representing That "Under the Influence of Extreme Mental Disturbance" Requires Causation

Cross argues that his lawyers were prejudicially ineffective for permitting the State to argue that the mitigating factor of "extreme mental disturbance" requires a causal connection between the mental disturbance and the murder. This claim fails because the State argued a reasonable interpretation of the statute and the jury was properly instructed to consider all mitigating evidence.

RCW 10.95.070 lists several mitigating factors, one of which is that the "murder was committed while the defendant was under the influence of extreme mental disturbance." RCW 10.95.070(2). In closing argument, defense counsel argued that the mental disturbance mitigating factor applied because Cross suffered from major depression at the time of the murders. In rebuttal, the prosecution argued that it did not apply because Cross's depression did not *cause* him to commit the murders.

An attorney may argue a reasonable interpretation of the law. Here, a reasonable reading of "while under the influence" is that the mental disturbance must influence or cause the defendant's conduct. *See State v. Davis*, 175 Wn.2d 287, 347, 290 P.3d 43 (2012) (sufficient evidence to support jury's findings that there were not sufficient mitigating circumstances because expert testimony tended to show defendant's diminished mental capacity *did not cause* him to commit the crime). Indeed, the State illustrates the absurdity of the petitioner's position: merely requiring temporal concurrence would mean that persons who suffer from arachnophobia (fear of spiders) would be entitled to invoke the statutory mitigating factor for killing, even if the killing has nothing to do with spiders. Thus, it was not deficient performance to permit the State to argue a reasonable interpretation of the statute.

In any case, there was no prejudice. Under the instructions given, reasonable jurors would believe they could consider any relevant mental health evidence as mitigating. Moreover, asking for a clarifying instruction may have actually harmed Cross more than helped him because the instruction likely would have stated that the statute requires causation. As it was, some jurors may have accepted the defense's position that only temporal concurrence was required. Thus, Cross has not shown a reasonable probability that objecting to the statement or that requesting a clarifying instruction would have affected the outcome of the trial.

5. Representing That "History of Criminal Activity" Included Defendant's Uncharged Criminal Acts

Petitioner argues that defense counsel was prejudicially ineffective for permitting the State to argue that the statutory mitigating factor of "history of criminal

activity" included uncharged acts of domestic violence. We find no deficient performance because defense counsel was not required to object or to request a clarifying instruction. Moreover, there was no prejudice.

In the State's closing argument, the prosecutor acknowledged that Cross had very few convictions but then suggested that he had "quite a bit of history of violence" because there was evidence he hit his first and second wives. Thus, they argue that the statutory mitigating factor of "no significant history of prior criminal activity" did not apply to Cross. The defense countered that "criminal activity" meant convictions, and Cross only had one misdemeanor conviction 10 years ago. So this mitigating factor applied.

Petitioner now argues that it was ineffective assistance of counsel to allow the prosecution to advance its line of reasoning because evidence of a defendant's prior criminal activity, other than convictions, is not admissible in the State's case in chief. *Bartholomew* I, 98 Wn.2d at 199, *aff'd on remand by Bartholomew* II, 101 Wn.2d at 644; *see* RCW 10.95.060(3). But *Bartholomew* interprets RCW 10.95.060, which concerns the admission of evidence, whereas RCW 10.95.070 lists statutory mitigating factors.

In *Delo v. Lashley*, 507 U.S. 272, 278, 113 S. Ct. 1222, 122 L. Ed. 2d 620 (1993), the Supreme Court reviewed a similar mitigating factor statute in Missouri. MO. REV. STAT. § 565.032(3)(1) (statutory mitigating factor shall include the defendant has no significant history of criminal activity). The Court explained that the statutory mitigating factor refers not only to arrests or convictions, but more broadly to "'criminal activity.'" *Delo*, 507 U.S. at 278. Thus, we find that the state's position was a

reasonable statement of the law and defense counsel's failure to object was not deficient performance.

In any case, we find no resulting prejudice because Cross cannot show a reasonable probability that the outcome would have differed had counsel objected. Reasonable jurors would believe that Cross's relatively clean criminal record could be considered as mitigation evidence.

Likewise, the failure to request an instruction clarifying the meaning of "criminal activity" was not deficient performance because the requested instruction would not have been given. *Bartholomew* and its progeny hold that evidence of nonstatutory aggravating factors must be limited to a defendant's record of convictions, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by defendant. *Bartholomew* II, 101 Wn.2d at 641-42; *see also Lord,* 117 Wn.2d at 890; *State v. Pirtle,* 127 Wn.2d 628, 666, 904 P.2d 245 (1995); *State v. Stenson,* 132 Wn.2d 668, 745, 940 P.2d 1239 (1997); *State v. Roberts,* 142 Wn.2d 471, 14 P.3d 713 (2000). Thus, *Bartholomew* deals with admissibility of evidence. Here, as discussed above, the testimony regarding Cross's prior acts of domestic violence was properly admitted as rebuttal evidence. Once evidence of nonadjudicated criminal acts is properly admitted, the jury can consider it as evidence of "prior criminal activity" under RCW 10.95.070(1). That is, once the evidence is deemed admissible under *Bartholomew,* it is proper fodder for proving an aggravating factor. As the state convincingly argues, the admission of rebuttal evidence would be pointless if the prosecutor could not argue its relevance, especially when defense counsel argues in closing that Cross's prior history of criminal activity is de minimis.

The *Bartholomew* rule generally barring admission of nonadjudicated criminal acts does not extend to bar argument on properly admitted rebuttal evidence. Thus, it was not deficient performance for Cross's trial counsel to fail to request an instruction that would not have been given.

Moreover, even had counsel requested the instruction and even had the judge granted the request, Cross has not shown a reasonable probability that the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Accordingly, we reject this ineffective assistance of counsel claim.

*T. Conclusion*

Cross fails to show that the specific acts or omissions complained of fell outside the wide range of professional competent assistance, resulting in prejudice. Thus, under *Strickland*, Cross's ineffective assistance of counsel claims fail.

V.   Constitutionality of the Death Penalty

Cross claims that Washington's death penalty statute violates the state and federal constitutions because it is arbitrarily applied. *See* ch. 10.95 RCW. On Cross's direct appeal, we rejected identical claims. *Cross*, 156 Wn.2d at 622-26. Cross may not raise an issue in a personal restraint petition that was raised and rejected on direct appeal, unless the interests of justice require relitigation of that issue. *In re Pers. Restraint of Davis*, 152 Wn.2d at 671; *In re Pers. Restraint of Lord*, 123 Wn.2d at 303. A petitioner can show that the interests of justice require relitigation of an issue by showing either that there has been an intervening change in the law or there is "'some other justification for having failed to raise a crucial point or argument in the prior application.'" *Gentry*, 137 Wn.2d at 388 (internal quotation marks omitted) (quoting *In*

63

*re Pers. Restraint of Taylor,* 105 Wn.2d 683, 688, 717 P.2d 755 (1986)). Cross fails to make either showing.

A. *Violation of Article I, Section 14 of the Washington Constitution and the Fifth and Eighth Amendments to the United States Constitution*

On direct appeal, we rejected Cross's claim that Washington's death penalty is arbitrarily applied and, thus, violates the Eighth Amendment prohibition against "cruel and unusual punishment." U.S. CONST. amend. VIII. There have been no intervening changes in the law that would require reconsideration of the issue, so this claim is barred.

We have consistently recognized that a "sentencing scheme must not allow the death penalty to be wantonly or freakishly imposed, it must direct and limit jury discretion, to minimize the risk of arbitrary or capricious action, and it must allow particularized consideration of relevant aspects of the character and record of each defendant, and the circumstances of the offense, before imposition of the sentence." *State v. Dodd,* 120 Wn.2d 1, 13 n.2, 838 P.2d 86 (1992) (citing *Gregg v. Georgia,* 428 U.S. 153, 188-89, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 304-05, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976)); *accord State v. Yates,* 161 Wn.2d 714, 792, 168 P.3d 359 (2007). On Cross's direct appeal, we held that Washington's death penalty statute meets this standard. *Cross,* 156 Wn.2d at 623. We explained that eight statutory protections, along with statutorily mandated proportionality review, "prevent[ ] arbitrary and capricious application of the death penalty." *Id.* at 623-24. Our statutes "properly constrain prosecutorial discretion in seeking the death penalty; they properly direct the jury to consider appropriate factors;

and they provide for meaningful mandatory appellate review in every case." *Id.* at 623. Thus, this claim is barred.

Because Cross cannot establish that chapter 10.95 RCW violates the Eighth Amendment, his claim that the statute violates article I, section 14 of the Washington State Constitution is also unavailing. *See Dodd,* 120 Wn.2d at 22 (concluding that "[t]he *Gunwall* factors do not demand that we interpret Const. art. 1, § 14 more broadly than the Eighth Amendment").

Petitioner's other arguments are unconvincing. Once again, Cross points out that mass murderers such as Gary Ridgway are sentenced to life without parole, while defendants convicted of allegedly less grievous crimes, like Cross, are put to death. Cross's reliance on Ridgway's life sentence is no more availing now than it was on direct appeal. *See also Yates,* 161 Wn.2d at 792.

Cross points to ABA findings, released in October of 2007, that state death penalty systems are deeply flawed. The ABA studied eight states to reach its findings. Notably, Washington was not one of them.[22] Of the states studied, some did not require any proportionality review at all, and, in those that did, the review tended to be cursory and included only cases where death was imposed, leaving out potentially important cases where death was sought but not imposed and where death could have been, but was not, sought. *See* ABA MORATORIUM IMPLEMENTATION PROJECT, STATE DEATH PENALTY ASSESSMENTS: KEY FINDINGS (2007).[23] By contrast, our statute

---

[22] The ABA studied Alabama, Arizona, Florida, Georgia, Indiana, Ohio, Pennsylvania, and Tennessee.

[23] *Available at* http://www.abanet.org/moratorium/assessmentproject/keyfindings.doc.

requires that trial judges submit reports in all cases where a person is convicted of aggravated first degree murder. RCW 10.95.120. Using these reports, a reviewing court must determine whether the sentence of death is excessive or disproportionate to the penalties imposed in "similar cases." RCW 10.95.130(1)(b). "Similar cases" means cases in which the judge or jury considered the imposition of capital punishment, regardless of whether it was imposed or executed. *Id.*

Cross also argues that in light of the Gary Ridgeway experience, prosecutors in Washington are declining to seek the death penalty in countless cases and the result is arbitrary imposition of the death penalty. We rejected this line of reasoning in *Yates* because "one prosecutor's discretion [cannot] render 10.95 RCW unconstitutional." *Yates*, 161 Wn.2d at 793. Thus, Cross fails to show that the interests of justice require reconsideration of his argument that Washington's death penalty is arbitrary, in contravention of the Eighth Amendment.

B. *Violation of the Due Process Clause*

Cross also argues that because the death penalty is applied arbitrarily and capriciously, his death sentence violates his Fifth Amendment right to due process. As discussed above, our statutes provide for adequate protections and meaningful mandatory review of death sentences. Specifically, a reviewing court will conduct a proportionality review based on four key factors: the nature of the crime, the aggravating circumstances, the defendant's criminal history, and the defendant's personal history. *Cross,* 156 Wn.2d at 630-31. In *Pirtle,* 127 Wn.2d at 683, we rejected a due process challenge to our proportionality review, noting that the court has "an explicit framework for analysis." Thus, Cross's claim fails.

66

## C. *Constitutionality of Washington's Lethal Injection Protocol*

In his placeholder petition, Cross argued that Washington's lethal injection protocol is unconstitutional.[24] However, this claim is moot because in 2010, Washington changed its lethal injection protocol from three drugs to one drug. *See Brown v. Vail*, 169 Wn.2d 318, 237 P.3d 263 (2010) (ruling on consolidated claims of three death row inmates, Darold Stenson, Cal Brown, and Jonathan Gentry, that Washington's three-drug lethal injection protocol is unconstitutional).

## CONCLUSION

Cross has not shown actual and substantial prejudice from any of the actions of which he complains. We dismiss his petition.

---

[24] On March 6, 2009, this court granted, in part, Cross's discovery request for information relating to Washington's three-drug lethal injection protocol. On April 3, 2009, we granted a stay on all outstanding issues raised in this case, pending resolution of the *Alford* plea issues. On Nov. 6, 2009, we denied the State's request to lift the stay regarding the legality of Washington's lethal injection protocol and granted parties leave to renew the motion to lift the stay once we decided whether to retain Supreme Court No. 83474-1, regarding petitioners Brown, Stenson, and Gentry. We retained the case and filed an opinion in July 2010. *Brown v. Vail*, 169 Wn.2d 318, 237 P.3d 263 (2010).

No. 79761-7

Wiggins, J.

WE CONCUR.

Madsen, C.J.

Johnson, J.

Owens, J.

Fairhurst, J.

_____, P.T.

Stephens, J.

González, J.

Worswick, J.P.T.