FILED
OCTOBER 11, 2016
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33329-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ANTHONY RAY AGUILAR, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Anthony Aguilar appeals his conviction for unlawful possession of a controlled substance. He argues his postarrest statement to the police was the result of a custodial interrogation without *Miranda*[1] warnings and was therefore inadmissible. He also argues, and the State agrees, that the trial court erred in imposing $660 in discretionary legal financial obligations (LFOs) without making an adequate inquiry into his ability to pay. We disagree with Mr. Aguilar's first argument, but remand for an individualized inquiry into Mr. Aguilar's ability to pay discretionary LFOs.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

FACTS

On March 11, 2015, Detective Roman Trujillo was driving in Kennewick, Washington, when he saw Mr. Aguilar standing in the roadway and holding his cellular telephone toward the sky in an attempt to get a Wi-Fi signal. Mr. Aguilar was blocking the roadway, so Detective Trujillo stopped his vehicle and spoke with Mr. Aguilar. Detective Trujillo got Mr. Aguilar's name and asked dispatch to check for warrants. Detective Chris Bennett and Officer Wayne Meyer arrived at the scene. Dispatch then told Detective Trujillo that Mr. Aguilar had a warrant for his arrest.

Detective Trujillo and Officer Meyer placed Mr. Aguilar under arrest and searched him incident to arrest. Detective Trujillo found a hypodermic needle and a clear plastic "baggie" in Mr. Aguilar's coat pocket. The "baggie" contained a small amount of a white crystal substance. Detective Trujillo held up the "baggie" and said, "[T]his looks like Meth." Clerk's Papers (CP) at 41. Mr. Aguilar responded, "Yes, it is, sir." CP at 41. At the time of these statements, Detective Trujillo had not given Mr. Aguilar his *Miranda* warnings.

Detective Trujillo sent the "baggie" to the Washington State Patrol Crime Laboratory for testing. The white crystal substance contained methamphetamine.

2

The State charged Mr. Aguilar with unlawful possession of a controlled substance. Mr. Aguilar moved to suppress his statement to Detective Trujillo under CrR 3.5. During the CrR 3.5 hearing, the State asked Detective Trujillo to whom he directed the statement. Detective Trujillo responded he "said it out loud," and also noted, "Obviously, [Mr. Aguilar] was standing there because I'm searching him. Officer Meyer was standing there as well." Report of Proceedings (RP) (May 6, 2015) at 7. The State asked Detective Trujillo if he directed his statement to anyone specific, and Detective Trujillo responded, "It was a general remark." RP (May 6, 2015) at 7. Detective Trujillo also testified he did not intend to ask Mr. Aguilar questions about the methamphetamine. Finally, Detective Trujillo testified Mr. Aguilar did not appear to be under the influence, did not appear to have difficulty understanding directions or questions, and was extremely pleasant and cooperative.

The trial court found Detective Trujillo's statement was not designed or likely to elicit an incriminating response. The trial court further found Mr. Aguilar's statement to Detective Trujillo was made spontaneously and was not in response to a custodial interrogation or direct questioning from law enforcement. Accordingly, the trial court concluded the statement was admissible.

3

The trial court held a bench trial on stipulated facts and found Mr. Aguilar guilty of unlawful possession of a controlled substance. The trial court then imposed a $2,000 fine and $1,460 in other LFOs. The LFOs comprised $660 in discretionary costs, which included a $600 court-appointed attorney fee, and a $60 sheriff's service fee. Before imposing the discretionary LFOs, the trial court conducted the following inquiry:

> [THE COURT]: How do you normally support yourself, sir?
> DEFENDANT AGUILAR: I work, Ma'am.

RP (May 11, 2015) at 5. The judgment and sentence contained the following boilerplate language: "The defendant has the ability or likely future ability to pay the legal financial obligations imposed herein." CP at 11. Mr. Aguilar did not object to the LFOs at the sentencing hearing. Mr. Aguilar appeals.

## ANALYSIS

A. POSTARREST STATEMENT

Mr. Aguilar argues his postarrest statement to Detective Trujillo—in which he admitted the substance inside the "baggie" was methamphetamine—was inadmissible because it was the result of a custodial interrogation without *Miranda* warnings. The parties agree Mr. Aguilar was in custody and had not received *Miranda* warnings. The issue is whether Detective Trujillo was engaged in "interrogation" for *Miranda* purposes when he held up the plastic "baggie" and said, "[T]his looks like Meth."

4

When determining whether officers are engaged in interrogation for purposes of requiring *Miranda* warnings, this court defers to the trial court's findings of fact but reviews its legal conclusions from those findings de novo.[2] *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 681, 327 P.3d 660 (2014). Because neither party has assigned error to any of the trial court's factual findings, we treat the findings as verities on appeal and confine our review to whether the trial court derived proper conclusions of law from its findings. *Id.*

*Miranda* warnings are necessary when a suspect in custody is subjected to interrogation or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). "Interrogation" includes express questioning, but also includes any words or actions by the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Id.* at 301. The test for the latter category focuses primarily on the suspect's perceptions, rather than the officer's intent. *Id.* An important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating

---

[2] Mr. Aguilar states that "[a] trial court's factual determination that remarks are not interrogation is reviewed under the 'clearly erroneous' standard." Br. of Appellant at 7 (citing *State v. Walton*, 64 Wn. App. 410, 414, 824 P.2d 533 (1992)). *Cross* abrogated *Walton*'s holding that the issue of interrogation is factual and subject to a clearly erroneous standard. *See In re Pers. Restraint of Cross*, 180 Wn.2d 664, 681 n.8, 327 P.3d

response is knowledge by the police that a defendant is unusually susceptible to a particular form of persuasion. *Id.* at 302 n.8.

Conversely, incriminating statements that are not responsive to an officer's remarks are not products of interrogation. *Cross*, 180 Wn.2d at 685; *State v. Bradley*, 105 Wn.2d 898, 904, 719 P.2d 546 (1986). This includes statements that are the result of "subtle compulsion," which is different than "interrogation." *Innis*, 446 U.S. at 303.

The United States Supreme Court addressed the "interrogation" necessary to trigger *Miranda* warnings in *Rhode Island v. Innis*. In that case, the police received a telephone call from a taxi driver who had just been robbed by a man wielding a sawed-off shotgun. *Innis*, 446 U.S. at 293. The taxi driver identified Thomas Innis as the robber. *Id.* The police later arrested Mr. Innis, who was unarmed, and advised him of his *Miranda* rights. *Id.* at 294. Mr. Innis invoked his right to counsel. *Id.* The police then began driving him to the police station, with three officers accompanying him in the police car. *Id.*

On the way to the station, the officers began discussing the missing shotgun from the robbery. *Id.* One officer stated that there were "'a lot of handicapped children running around in this area'" because a school was located nearby, and "'God forbid one

660 (2014).

6

of them might find a weapon with shells and they might hurt themselves.'" *Id.* at 294-95.
The same officer then stated, "'[I]t would be too bad if the little [girl] would pick up the
gun, maybe kill herself.'" *Id.* at 295. Mr. Innis, apparently worried for the children,
interrupted the officers and asked them to turn back so he could show them where the gun
was located. *Id.*

The court held Mr. Innis was not "interrogated" within the meaning of *Miranda*.
*Id.* at 302. The court first held the officers did not expressly question Mr. Innis, given
that the conversation was "nothing more than a dialogue between the two officers" and
did not invite a response from Mr. Innis. *Id.* The court also held the officers'
conversation was not reasonably likely to elicit an incriminating response from Mr. Innis.
*Id.* The court reasoned there was nothing in the record to suggest the officers were aware
that Mr. Innis was "peculiarly susceptible to an appeal to his conscience concerning the
safety of handicapped children," nor was there any evidence the officers knew Mr. Innis
was unusually disoriented or upset at the time of his arrest. *Id.* at 302-03. The court
further reasoned that the entire conversation "consisted of no more than a few off hand
remarks," and the officers' comments were not particularly "evocative." *Id.* at 303. The
court acknowledged Mr. Innis was subjected to "subtle compulsion," but was not
interrogated. *Id.*

7

In contrast, Mr. Aguilar relies on *In re Pers. Restraint of Cross.* In *Cross*, Dayva Cross stabbed his wife and her daughters to death. *Cross*, 180 Wn.2d at 675. Officers arrested Mr. Cross and took him to the police station. *Id.* at 678. At the station, one of the officers took pity on Mr. Cross and said, "'Sometimes we do things we normally wouldn't do, and we feel bad about it later.'" *Id.* at 679. Mr. Cross responded, "'How can you feel good about doing something like this.'" *Id.*

The *Cross* court concluded the officer's comment, while not express questioning, was the "'functional equivalent of questioning.'" *Id.* at 686 (quoting *Innis*, 446 U.S. at 302). The court reasoned that unlike the comments at issue in *Innis*, the officer spoke directly to Mr. Cross. *Cross*, 180 Wn.2d at 686. Moreover, the officer could tell Mr. Cross was upset because of the murders, which had just occurred that morning, and the officer's comment was evocative in that it referred to the recent killings, which were brutal, emotional, and involved Mr. Cross's family. *Id.* Although the officer's remark was not phrased as a question, the court still held it reasonably elicited an incriminating response. *Id.*

The court further reasoned the officer's comment was reasonably likely to elicit an incriminating response because it implied Mr. Cross committed the murders, and all the possible responses to the officer's comment were incriminating—silence could be

8

evidence of guilt, denial or feigning ignorance could cast doubt on his character for honesty, or Mr. Cross could respond as he did and essentially confess. *Id.* at 686. The court then held, "An officer's comment is designed to elicit an incriminating response when a suspect's choice of replies to that comment are all potentially incriminating." *Id.*

Here, Detective Trujillo did not expressly question Mr. Aguilar. Detective Trujillo testified he made the statement "out loud" and that it "was a general remark," rather than being directed at anyone specific. RP (May 6, 2015) at 7. Like in *Innis*, the remark did not invite a response from Mr. Aguilar. Detective Trujillo also testified he did not intend to ask Mr. Aguilar questions about the methamphetamine, which is relevant in determining whether a defendant was expressly questioned. *See Innis*, 446 U.S. at 301.

The closer question is whether Detective Trujillo subjected Mr. Aguilar to the "functional equivalent" of questioning, i.e., whether he should have known that his remark was reasonably likely to elicit an incriminating response. This case has more in common with *Innis* than *Cross*. Important factors for the *Innis* court were that the officers did not target Mr. Innis's particular susceptibilities nor was Mr. Innis unusually disoriented or upset. The *Cross* court relied on these same factors in holding that Mr. Cross *was* subjected to the functional equivalent of questioning—the officer could tell Mr. Cross was upset because of the very recent murders, and her comment was evocative

9

in that it referred to the recent killings, which were brutal and emotional and involved Mr. Cross's family. Here, however, Detective Trujillo testified Mr. Aguilar did not appear to be under the influence, did not appear to have difficulty understanding directions or questions, and was extremely pleasant and cooperative.

Further, and most importantly, like the comment in *Innis* and unlike the comment in *Cross*, Detective Trujillo did not speak directly to Mr. Aguilar. Because of this, the central reasoning on which the *Cross* court relied—that all of the possible responses to the officer's comment were potentially incriminating—does not apply in this case. Rather, because Detective Trujillo's remark was not directed at Mr. Aguilar and did not invite a response from him, if Mr. Agular had simply opted to remain silent it would not have been evidence of guilt and would not have been potentially incriminating.

Like in *Innis*, Mr. Aguilar may have been subjected to "subtle compulsion," but he was not "interrogated" for purposes of requiring *Miranda* warnings.

B. UNPRESERVED ALLEGED LFO ERROR

Mr. Aguilar contends the sentencing court erred by ordering him to pay $660 in discretionary LFOs without first making an adequate inquiry into his ability to pay.[3] The

---

[3] Mr. Aguilar contends that the trial court imposed $2,660 in discretionary LFOs, consisting of the $2,000 fine, the $600 court-appointed attorney and the $60 sheriff's service fee. *See* Br. of Appellant at 4. However, this court recently held that a trial court

10

State concedes error and this court accepts the State's concession. Accordingly, we

remand for the trial court to make an individualized inquiry into Mr. Aguilar's ability to

pay discretionary LFOs. *See State v. Hart*, No. 47069-1-II, 2016 WL 4366948, at \*6

(Wash. Ct. App. Aug. 16, 2016) (remanding for an individualized inquiry when the State

conceded error).

### C.   APPELLATE COSTS

Mr. Aguilar also asks this court to decline to impose appellate costs in its decision

terminating review. Mr. Aguilar raises a variety of arguments.

An appellate court has discretion to require a convicted defendant to pay appellate

costs to the State. *See* RCW 10.73.160(1); RAP 14.2. Generally, "the party that

substantially prevails on review" will be awarded appellate costs, unless the court directs

otherwise in its decision terminating review.[4] RAP 14.2. An appellate court's authority

to award costs is "permissive," and a court may, pursuant to RAP 14.2, decline to award

---

may impose fines under RCW 9A.20.021 *without* inquiring into a defendant's ability to
pay. *See State v. Clark*, 191 Wn. App. 369, 375-76, 362 P.3d 309 (2015); *State v. Calvin*,
176 Wn. App. 1, 25, 316 P.3d 496 (2013), *review granted in part*, 183 Wn.2d 1013, 353
P.3d 640 (2015).

[4] "A 'prevailing party' is any party that receives some judgment in its favor. If
neither party completely prevails, the court must decide which, if either, substantially
prevailed." *Guillen v. Contreras*, 169 Wn.2d 769, 775, 238 P.3d 1168 (2010) (citations
omitted). Here, the State is the substantially prevailing party because we affirmed the
primary issue that relates to Mr. Aguilar's conviction.

11

costs at all. *State v. Nolan*, 141 Wn.2d 620, 628, 8 P.3d 300 (2000).

On June 10, 2016, this court issued a general order regarding defendants' requests to deny cost awards when the State substantially prevails on appeal. It directs defendants who want this court to exercise its discretion not to impose appellate costs to make their request, together with citations to legal authority and references to relevant parts of the record, either in their opening brief or in a motion pursuant to RAP 17. Mr. Aguilar has complied with this particular requirement in his opening brief.

If inability to pay is a factor alleged to support the defendant's request, the general order also requires defendants to include in the appellate record the clerk's papers, exhibits, and the reports of proceedings relating to the trial court's determination of indigency and the defendant's current or likely ability to pay discretionary LFOs. Mr. Aguilar designated his RAP 15.2(a) motion and the trial court's order of indigency with the clerk's papers.[5] However, the general order requires defendants to file a report as to continued indigency with this court no later than 60 days after they file their opening briefs. Mr. Aguilar has not complied with this requirement. Because Mr. Aguilar has not complied with the court's general order, we will not exercise our discretion to waive

---

[5] Mr. Aguilar's RAP 15.2(a) motion was based on the fact that the trial court had previously made an indigency finding, and Mr. Aguilar has not designated any of these documents, or any other documents relating to his ability to pay LFOs, as part of the

12

appellate costs.

Mr. Aguilar raises a number of other arguments as to why this court should decline to impose appellate costs. He first argues that imposing appellate costs would violate the trial court's order of indigency granting him a right to appeal at public expense. However, while orders of indigency entered pursuant to RAP 15.2 allow criminal defendants to pursue appeals at public expense, they do not prevent the State from attempting to recoup costs if the defendant's appeal is unsuccessful. *See generally State v. Obert*, 50 Wn. App. 139, 143, 747 P.2d 502 (1987) (holding that orders of indigency do not prohibit cost awards against indigent parties because "once defendants enjoy full participation in the process of appellate review, the Rules of Appellate Procedure clearly allow the assessment against them of reproduction and other costs as a reasonable expense necessary for review").

Mr. Aguilar also argues that the appellate cost system undermines the attorney-client relationship and creates a conflict of interest because the Office of Public Defense only gets paid when its client loses. These problems are possible, but Mr. Aguilar has not provided any legal authority, cited any empirical research, given any concrete examples where this has occurred in other cases, or provided any evidence that the attorney-client

appellate record.

13

relationship was undermined or a conflict of interest occurred in this case. *See*

RAP 10.3(a)(6); *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012)

(appellate courts do not consider "bald assertions lacking cited factual and legal

support").

Mr. Aguilar also argues that county prosecutors seek costs to punish defendants for

exercising their constitutional rights to counsel and to appeal, as evidenced by the

inconsistency at which they file cost bills and the small portion of appellate costs

prosecutors' offices receive. This argument fails for the same reason as his previous

argument. *See* RAP 10.3(a)(6); *West*, 168 Wn. App. at 187.

Mr. Aguilar also argues that this court should not award appellate costs because of

the problems *State v. Blazina*[6] recognized—compounding interest, retention of trial court

jurisdiction, difficulty reentering society, and no right to counsel for remission

proceedings—apply equally to appellate costs. However, unlike RCW 10.01.160(3),

which was at issue in *Blazina*, the statute authorizing appellate costs does not require an

inquiry into the defendant's financial resources before appellate costs are imposed. *See*

RCW 10.73.160; *State v. Sinclair*, 192 Wn. App. 380, 389, 367 P.3d 612, *review denied*,

185 Wn.2d 1034, 377 P.3d 733 (2016) (noting that while ability to pay is an important

---

[6] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).

14

factor that may be considered under RCW 10.73.160, it is not necessarily the only relevant factor, nor is it necessarily an indispensable factor); *State v. Wright*, 97 Wn. App. 382, 384, 985 P.2d 411 (1999) (finding that RCW 10.73.160 only requires an inquiry into ability to pay at the point of collection, and not when the recoupment order is made). This argument, while persuasive, is an appeal to this court's discretion, the exercise of which this court has already delineated in its general order.

Mr. Aguilar also argues that imposing appellate costs on a defendant who lacks the ability to pay violates substantive due process because no legitimate state interest is advanced by imposing costs on defendants who cannot pay them. However, constitutional challenges to the imposition of LFOs generally turn on a defendant's financial circumstances at the time of recoupment. *State v. Mathers*, 193 Wn. App. 913, 928, 376 P.3d 1163 (2016) ("'[i]t is at the point of enforced collection . . ., where an indigent may be faced with the alternatives of payment or imprisonment, that he may assert a constitutional objection on the ground of his indigency'") (internal quotation marks omitted) (quoting *State v. Curry*, 118 Wn.2d 911, 917, 829 P.2d 166 (1992)); *State v. Blank*, 131 Wn.2d 230, 241, 930 P.2d 1213 (1997). Because recoupment has not begun, this court cannot yet assess those circumstances.

15

Finally, Mr. Aguilar argues that in the event this court determines appellate costs are appropriate, it should remand to the superior court for a fact-finding hearing regarding his ability to pay appellate costs. However, Division One has determined this is an inappropriate remedy for two reasons: (1) it "delegate[s] the issue of appellate costs away from the court that is assigned to exercise discretion," and (2) "it would also potentially be expensive and time-consuming for courts and parties." *Sinclair*, 192 Wn. App. at 389.

Because Mr. Aguilar has not complied with this court's general order and none of his other various arguments have merit, we tentatively award costs to the State as the substantially prevailing party on appeal. But should Mr. Aguilar file a declaration that comports with our June general order within 14 days of the filing of this decision, we give our commissioner discretion to allow the late declaration and deny the State an award of costs. If Mr. Aguilar does not file a declaration within 14 days, the State thereafter has 10 days to file a cost bill with this court pursuant to RAP 14.4(a).

## CONCLUSION

We affirm Mr. Aguilar's conviction, remand for the trial court to make an individualized inquiry into Mr. Aguilar's ability to pay discretionary LFOs, and award costs to the State as the prevailing party, subject to the conditions set forth above.

16

No. 33329-9-III
*State v. Aguilar*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Siddoway, J.

17