IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34057-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ARNULFO CISNEROS SANCHEZ, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Arnulfo Cisneros Sanchez appeals his convictions for attempted second degree rape, first degree burglary with sexual motivation, indecent liberties, and stalking. He also challenges a community custody condition that prohibits him from entering Grant County, where he and the victim were both longtime residents at the time of the crimes. We affirm the convictions but conclude that the community custody condition is not narrowly tailored to serve a compelling governmental interest. We remand for resentencing.

FACTS AND PROCEDURAL BACKGROUND

While asleep in her bedroom on the night of June 2, 2014, Camila Martin (a pseudonym) was awakened at around 11:30 p.m. by someone kissing her buttocks. She quickly rolled over and a man jumped on top of her and pinned her hands down by her shoulders. He had entered through her bedroom window, which was open because it was hot and her air conditioner was broken. She shook her head from side to side to prevent him from kissing her, and told him to "stop" and to "let go." Report of Proceedings (RP) at 73. He persisted, saying "I love you, I miss you . . . I desire you."[1] *Id.* There came a point when the man let go of one of her arms and she was able to escape his grasp. He then jumped out the window and drove away in a small car.

Ms. Martin did not immediately contact police, but reported the intrusion and assault the next day, after work, at the urging of coworkers. She spoke with Deputy Korey Judkins. She could not identify her attacker, but said he had a hairy back, and a voice and build similar to her ex-husband's, though her ex-husband was a little bit shorter. While she thought the intruder had been her ex-husband, she also provided the deputy with the name Arnulfo Cisneros Sanchez, the husband of her close friend Alejandrina Sanchez, because he was the only other man who came to her house. He had been at her home on the day of the assault, installing a part on her truck.

---

[1] These statements were all made in Spanish.

A few hours after speaking with Deputy Judkins, Ms. Martin contacted the deputy to report she had noticed some "stuff" on the outside of the underwear she was wearing when assaulted. He obtained them for DNA[2] testing by the Washington State Patrol Crime Laboratory.

Six weeks later, on July 20, Ms. Martin heard a car in her driveway in the late morning, looked outside, and saw Mr. Sanchez walking in her front yard. She would later testify that when she saw him, "everything came to [her] head" and she started shaking. RP at 83. A call she had received from Mr. Sanchez in the prior weeks to see how her truck was running had not triggered any recognition, but seeing him in her yard gave her the strong sense that it was he who had climbed through her bedroom window and assaulted her on June 2. She dropped to the floor, got the telephone, and called 911. Deputy Darrik Gregg and another officer responded to the 911 call, and she told them she called because she now believed Mr. Sanchez was the one who had broken into her home and assaulted her on June 2. The deputy spoke to Mr. Sanchez, who said he was there to recover a battery charger. The deputy told him he was no longer welcome on the property and must leave.

Nearly eight months later, on February 13, 2015, at about 5:15 a.m., Ms. Martin saw a bright light shining outside her window and then saw someone run away and drive

---

[2] Deoxyribonucleic acid.

3

off in a car with a loud muffler reminiscent of the car that had driven off the prior June 2. She called 911 but when nobody had responded by midmorning, she went to Yakima to fill out preliminary paperwork to acquire a gun. She also bought a flashlight and a baseball bat.

The next day, also at about 5:15 a.m., Ms. Martin heard someone outside her window. She got out of bed, opened the curtains, and pointed the flashlight out the window, encountering Mr. Sanchez. She hit the window, yelled at him to "get out," and called the police. RP at 92. Deputy Raymond Appling responded to the call and was told by Ms. Martin that she was positive it was Mr. Sanchez who had been looking in her window.

Mr. Sanchez was charged a few days thereafter. Eventually, he was charged with first degree burglary with a special allegation of sexual motivation, indecent liberties, and attempted rape in the second degree for the June 2 intrusion and assault; with stalking during a time frame from July 20, 2014 through February 15, 2015; and with criminal trespass in the second degree for returning to Ms. Martin's home on February 14, 2015.

Opening statements at trial were not transcribed, but it is apparent from a conversation among lawyers and the court shortly after they occurred that the defense told jurors that Mr. Sanchez admitted to sexual contact with Ms. Martin on June 2, 2014, but claimed it was consensual. In light of that defense, the lawyers told the court Mr. Sanchez would stipulate that the semen on Ms. Martin's underwear was Mr. Sanchez's.

4

The prosecutor also stated at that point, "I'm making the assumption that the defendant will be testifying," to which defense counsel voiced no disagreement. RP at 53.

The State called as trial witnesses Ms. Martin, and Deputies Judkins, Gregg, and Appling. It elicited testimony from the three deputies about what they had been told by Ms. Martin on June 2, July 20, and February 14. The defense did not object.

Mr. Sanchez and his wife both testified in the defense case. Mr. Sanchez testified that he had been working on Ms. Martin's car on June 2, 2014, checking the oil filter with a flashlight, when she came out, commented that the flashlight would be a good signal, and asked if he could stay to fix her outdoor lamp. He agreed and began to do so, and when she brought him a glass of water he requested, she had changed into bicycle shorts and a "very open" blouse. RP at 216. According to him, she touched Mr. Sanchez and asked suggestively if he was going to come back later to finish fixing the lamp.

He testified that he returned to her home late that night, climbed through her window and hugged her. He claimed she hugged him back, squeezed his hands and caressed him, and they had sex. Mr. Sanchez then went back out the window, put his clothes back on, and left.

He testified that the next time he saw her was on July 20 when he went to her home to collect his battery charger and was inexplicably told by two officers who came to the property that he needed to leave.

5

Mr. Sanchez testified that after that, he called Ms. Martin, using his work phone so that his wife would not see his calls on cell phone bills. He claimed that for a time Ms. Martin would speak to him, but she later stopped taking his calls. He testified that eventually—in mid-February 2015—regretting his infidelity, he went to Ms. Martin's home to apologize, going to her bedroom with the flashlight because "it was a way of [them] communicating." RP at 226. Instead, after seeing him, she called police.

Mrs. Sanchez testified to her growing concern in 2013 and 2014 that her husband and Ms. Martin were involved. She testified that Mr. Sanchez began acting coldly toward her; Ms. Martin began calling Mr. Sanchez directly when she needed repairs rather than going through her; Ms. Martin quit calling her; and Mr. Sanchez began using the informal familiar "tu" form with Ms. Martin, instead of the formal "usted" form he had used in the past.[3] She said she confronted her husband about her suspicions but he denied that anything was going on.

The jury found Mr. Sanchez guilty of all charges except the charge of second degree criminal trespass. In imposing sentence, the court imposed lifetime community custody for the attempted rape charge including a condition that "[d]efendant shall not enter Grant County." Clerk's Papers (CP) at 139. Mr. Sanchez appeals.

---

[3] This change in language indicates a closer relationship, as "tu"—i.e. "you"—is used with family and friends or younger individuals. The "usted" form—which can also mean "you"—indicates respect or unfamiliarity. It is used with elders, people in positions of authority, and strangers.

ANALYSIS

*Ineffective assistance: failure to object to hearsay*

Mr. Sanchez first argues that he received ineffective assistance when his trial counsel failed to object to Deputy Judkins's testimony that Ms. Martin told him on June 2 that she had been raped the night before, Deputy Gregg's testimony that on July 20 she told him that she had previously been raped and now believed it had been by Mr. Sanchez, and Deputy Appling's testimony that she identified Mr. Sanchez as the individual at her window on February 14. He argues that all of the testimony was hearsay, to which no exception applied, and that the officers' testimony "lent an aura of credibility to those claims that was otherwise absent." Br. of Appellant at 12. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible unless it falls under an exception or exclusion to the hearsay rule. ER 801(c); ER 802.

To prevail on an ineffective assistance of counsel claim, a criminal defendant must demonstrate (1) deficient performance by counsel and (2) resulting prejudice. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 693, 327 P.3d 660 (2014) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). If the court finds either prong has not been met, it need not address the other prong. *Id.* (citing *Strickland*, 466 U.S. at 700).

7

Deficient performance is determined using an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705-06, 940 P.2d 1239 (1997). We strongly presume that counsel's representation was effective. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012).

Trial counsel's failure to object is not deficient performance if there was a legal basis for admitting the evidence. The State contends that the deputies' statements were nonhearsay statements of identification under ER 801(d)(1)(iii), which provides that a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is . . . one of identification of a person made after perceiving the person." The exception can apply to a witness's identification of a defendant, by name, to an investigating officer. *State v. Grover*, 55 Wn. App. 252, 254-57, 777 P.2d 22 (1989).

Deputy Appling's testimony that Ms. Martin identified Mr. Sanchez as the person she saw at her window on February 14 was a statement of identification under ER 801(d)(1)(iii). As she testified and was subject to cross-examination about her statement at trial, it was admissible, and defense counsel's failure to object cannot have been deficient performance.

With regard to what Mr. Sanchez contends was the objectionable aspect of the testimony of Deputies Judkins and Gregg, however, ER 801(d)(1)(iii) does not apply. Mr. Sanchez does not object to the deputies' testimony that Ms. Martin identified him as

8

the man in her bedroom on June 2; such an objection would be pointless where Mr. Sanchez conceded he was the man in her bedroom. Mr. Sanchez challenges the deputies' testimony that Ms. Martin told them on those earlier occasions that she had been *raped* on June 2, which corroborated her story at trial and made her appear more credible.

But trial counsel's performance is also not deficient if there was a strategic reason for not objecting to otherwise-objectionable evidence. It is the defendant's burden to show, based on the record, that there are no "'legitimate strategic or tactical reasons'" for his lawyer's challenged conduct. *Emery*, 174 Wn.2d at 755 (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)).

Mr. Sanchez was represented by capable counsel, presenting a difficult defense. He admitted that it was he who had entered through Ms. Martin's window and that he had sex (which would have been compellingly supported by the DNA evidence if he had not admitted it). Ms. Martin—a cooperative and well prepared witness for the State— testified to her timely report of the assault to police on June 3 and her further report on July 20, when seeing Mr. Sanchez triggered her strong sense that he had been the intruder. Even if the officers had not corroborated that reports were made, her testimony that she made the two reports to police would go unchallenged.

Given this evidence, the defense argued that reasonable doubt was raised by the fact that Ms. Martin did not blame Mr. Sanchez for the assault initially, identifying him only as a possibility that she herself discounted. As defense counsel argued in closing, at

9

such close quarters, how could she not recognize a man she had known for 20 years? The defense's implication was that she did not name Mr. Sanchez as the intruder because she knew his presence was invited.

As the State points out, the defense had its problems (If she didn't want to accuse him because the sex was consensual, why accuse him at all? Why provide her underwear for DNA testing?)—but it *was* Mr. Sanchez's defense. And where the gist of the defense was that Ms. Martin's failure to accuse him initially created reasonable doubt, then the testimony of Deputies Judkins and Gregg that Ms. Martin did not initially believe Mr. Sanchez was the intruder was helpful. Defense counsel might also have believed that by defending on the basis that Ms. Martin's late-acquired certitude about Mr. Sanchez being the attempted rapist was not credible, giving rise to reasonable doubt, it had opened the door to her prior *consistent* statement that Mr. Sanchez was a possibility. *See* ER 801(d)(1)(ii).

In any event, given the evidence and the defense, tactical reasons existed for Mr. Sanchez's trial lawyer to refrain from objecting to the deputies' testimony. Because Mr. Sanchez does not demonstrate deficient performance, we need not consider prejudice.

*Community custody condition: exclusion from Grant County*

Mr. Sanchez's remaining challenge is to the constitutionality of the community custody condition that bars him from entering Grant County for the rest of his life.

10

An order banishing an individual from a large geographical area raises, at the least, a public policy concern that a convict is being "dump[ed]" on neighboring counties or cities; at the most, it encroaches "on an individual's constitutional right to travel, which includes the right to travel within a state." *State v. Schimelpfenig*, 128 Wn. App. 224, 226, 115 P.3d 338 (2005) (citing *Shapiro v. Thompson*, 394 U.S. 618, 630-31, 634, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)). Because of the constitutional implications of a banishment order, courts apply strict scrutiny and uphold the order only if it is narrowly tailored to serve a compelling governmental interest. *State v. Sims*, 152 Wn. App. 526, 531, 216 P.3d 470 (2009), *aff'd*, 171 Wn.2d 436 (2011); *Schimelpfenig*, 128 Wn. App. at 226.

The following nonexclusive factors assist courts in determining whether a specific geographic restriction permissibly infringes on a defendant's right to travel:

> (1) whether the restriction is related to protecting the safety of the victim or witness of the underlying offense; (2) whether the restriction is punitive and unrelated to rehabilitation; (3) whether the restriction is unduly severe and restrictive because the defendant resides or is employed in the area from which he is banished; (4) whether the defendant may petition the court to temporarily lift the restriction if necessary; and (5) whether less restrictive means are available to satisfy the State's compelling interest.

*Id.* at 229.

11

No. 34057-1-III
*State v. Cisneros Sanchez*

Mr. Sanchez lived and worked in Grant County for nearly two decades before his arrest. The State concedes that the community custody condition is not narrowly tailored. It agrees we should remand for entry of a narrowly-tailored order that impinges on Mr. Sanchez's right to travel only so far as is reasonably necessary to protect Ms. Martin and her family from future harm or harassment. We accept the State's concession.

We affirm the convictions and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

12